Filed 4/8/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LARRY LEE,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>AMAZON.COM, INC.,<br><br>        Defendant and Respondent. | A158275<br><br>(Alameda County<br>Super. Ct. No. RG14738130)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT** |

**THE COURT:**

It is ordered that the opinion filed herein on March 11, 2022, be modified as follows:

1.  On page 4, second line of first full paragraph, delete the words "purchased from Amazon."

2.  On page 4, at the end of the first full paragraph, add the following new final sentence:

> The Monsepa sample tested was purchased from aztopselstore.com and appears to be the same as the Monsepa product available from Amazon; the other four samples tested were from products purchased from Amazon.

3.  On page 11, first and second lines of last partial paragraph, delete the word "the" before "product page" and replace it with "Amazon's," delete the word "the" before "Monsepa," and delete the words "Lee had tested." These lines should read:

Steinberg was shown a customer comment on Amazon's product page for Monsepa cream saying the news had reported on January 9, . . .

4.  On page 12, second line of second partial paragraph, after "health risks from," delete the words "chemical exposures," and replace with "exposure to chemicals including mercury,"

5.  On page 12, delete everything after the first sentence of footnote 15 and replace it with the following:

He had taught part of a course on risk assessment at San Diego State University School of Public Health for about 20 years, worked with governmental committees on developing and defining methods to assess health risks, and performed more than 200 Proposition 65 risk assessments, of which more than 50 involved metals, more than 50 involved chemicals listed as reproductive or developmental toxicants, and "[a]lmost all" had a component of "generalizing data to the population of the products that we used."  Sheehan had experience evaluating mercury exposure in the contexts of site risk assessment, waste disposal, and a project involving removal of gas pressure regulators from homes.

6.  On page 18, delete footnote 16, and on page 28, delete footnote 19, which will require renumbering of all subsequent footnotes.

7.  On page 28, first line of first full paragraph, delete the word "five" and replace with "four."

8.  On page 28, second line of first full paragraph, after the words "Web site" add the following:  ", as well as a fifth such product that appears to be available for sale on the Web site,"  The first two lines should read:

Given the undisputed evidence that samples of four skin-lightening products purchased on Amazon's Web site, as well as a fifth such product that appears to be available for sale on the Web site, contained high levels of mercury as . . .

9.  On page 80, second line of second full paragraph of "DISPOSITION" section, add the word "four" before "products."

2

10.  On page 80, at the end of the second full paragraph of the "DISPOSITION" section, add the following new final sentence:

> As to the fifth product tested for this case, the trial court shall determine whether the Monsepa product available on Amazon's Web site was in fact the same product as the one tested.

11.  On page 80, after the second full paragraph of the "DISPOSITION" section, add the following new third paragraph:

> If any violations of Proposition 65 are established, the court shall determine the appropriate remedy in accordance with section 25249.7.

> There is no change in the judgment.  The petitions for rehearing are denied.

Dated: _____                    _____

                                                        Richman, Acting P.J.

Trial Court:                                          Alameda County Superior Court

Trial Judge:                                          Hon. Robert McGuiness

Attorney for Plaintiff and Appellant          Law Office of Jonathan Weissglass
Larry Lee:                                            Jonathan Weissglass

                                                      Greenfire Law
                                                      Rachel S. Doughty
                                                      Jessica L. Blome

Attorneys for Amicus Curiae on behalf         Rob Bonta
of Plaintiff and Appellant:                      Attorney General of California
                                                      Dennis A. Ragen
                                                      Roxanne Carter
                                                      Deputy Attorneys General

Attorneys for Amicus Curiae                    Danielle R. Fugere
As you Sow on behalf of Plaintiff              Chelsea J. Linsley
Appellant:

Attorneys for Amicus Curiae                    Altshuler Berzon
Center For Food Safety on behalf              Barbara J. Chisholm
of Plaintiff and Appellant:                      P. Casey Pitts

Attorneys for Amici Curiae Black              Environmental Law Clinic
Women for Wellness and the Mercury           Mills Legal Clinic at Stanford Law School
Policy Project/Tides Center on behalf         Deborah A. Sivas
of Plaintiff and Appellant:                      Molly Loughney Melius

Attorneys for Defendant                        Doll Amir & Eley
and Respondent Amazon.com, Inc.:              Gregory L. Doll
                                                      Brett H. Oberst
                                                      Jamie O. Kendall
                                                      Lloyd Vu

Attorneys for Amicus Curiae                    Law Office of Fred. J. Hiestand
The Civil Justice Association of              Fred J. Hiestand
California on behalf of Defendant
and Respondent:

Filed 3/11/22 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LARRY LEE,<br><br>        Plaintiff and Appellant,<br>v.<br><br>AMAZON.COM, INC.,<br><br>        Defendant and Respondent. | A158275<br><br>(Alameda County<br>Super. Ct. No. RG14738130) |

Under legislation enacted as Proposition 65 in 1986, businesses are prohibited from knowingly and intentionally exposing any individual to certain chemicals without first providing a warning. Lee seeks to hold Amazon.com, Inc. (Amazon) accountable for offering on its Web site, without warnings, certain skin-lightening face creams sold by third parties and alleged to contain mercury. The trial court concluded that Amazon is immune from liability under the federal Communications Decency Act (CDA) and also that Lee failed to establish several elements of his case under Proposition 65.

Lee maintains Amazon is not protected by the CDA and the trial court erred in its view of the evidence required to establish the alleged statutory violations.

1

We agree with Lee and, therefore, will reverse and remand for further proceedings.[1]

## BACKGROUND

California's Safe Drinking Water and Toxic Enforcement Act of 1986 (Act) (Health & Saf. Code, § 25249.5 et seq.), adopted by voter initiative in 1986 and commonly known as Proposition 65, provides, "No person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual, except as provided in Section 25249.10." (Health & Saf. Code, § 25249.6.) Mercury and mercury compounds were listed by the state as reproductive toxins under Proposition 65 in 1990. (Cal. Code. Regs., tit. 27,[2] § 27001, subd. (c); see Health & Saf. Code, § 25249.8.)[3]

---

[1] The Attorney General filed an amicus brief in support of Lee pursuant California Rules of Court, rule 8.200(c)(7). Exercising his authority to represent the public interest, the Attorney General explains he has a "special interest in the proper interpretation and enforcement of" Proposition 65 as the "public official with statewide authority to enforce" the Safe Drinking Water and Toxic Enforcement Act of 1986 and "the only public official with authority to review and comment on settlements entered into by private enforcers under Proposition 65."

Additionally, we granted applications to file amicus briefs from several nonprofit organizations whose missions relate to the subject matter of this case. We have received amicus briefs on behalf of Lee from As You Sow and Center for Food Safety, Black Women for Wellness and the Mercury Policy Project/Tides Center, and on behalf of Amazon from the Civil Justice Association of California.

[2] Further references to "Regulations" are to title 27 of the California Code of Regulations except as otherwise specified (e.g., Regs., § 25102).

[3] Under California law, a discarded substance is "hazardous waste" if it contains 20 milligrams per kilogram, 20 parts per million (ppm) or more of

2

Cosmetics containing one ppm (0.0001 percent) or more of mercury are prohibited under federal law. (21 U.S.C. § 331(a)–(c); 21 C.F.R. § 700.13(d)(2)(i).)[4] According to the FDA, "[t]he toxicity of mercury compounds is extensively documented in scientific literature. . . . Mercury is absorbed from topical application and is accumulated in the body, giving rise to numerous adverse effects. . . . [C]hronic use of mercury-containing skin-bleaching preparations has resulted in the accumulation of mercury in the body and the occurrence of severe reactions." (21 C.F.R. § 700.13(b).)

The present case concerns four brands of face creams advertised as skin-lightening or skin-whitening products: Faiza, Face Fresh, Monsepa, and Meiyong.

Lee's second amended complaint listed 27 products offered for sale on Amazon's Web site under these brand names, identified by individual product name or description and "Amazon Standard Identification Number" or

---

mercury. (Cal. Code Regs., tit. 22 §§ 66261.2, subd. (a), 66261.20, subd. (a), 66261.24, subd. (a)(2)(A).)

[4] Federal law prohibits "[t]he introduction or delivery for introduction into interstate commerce of any . . . cosmetic that is adulterated or misbranded," the "adulteration or misbranding of any . . . cosmetic in interstate commerce" and the "receipt in interstate commerce of any . . . cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise." (21 U.S.C. § 331(a)-(c).) The Food and Drug Administration (FDA) regards "any cosmetic containing mercury" as "adulterated" unless it contains "no more than a trace amount of mercury and such trace amount is unavoidable under conditions of good manufacturing practice and is less than 1 ppm (0.0001 percent), calculated as the metal" (21 C.F.R § 700.13(d)(2)(i)) or it is "intended for use only in the area of the eye, it contains no more than 65 ppm (0.0065 percent) of mercury, calculated as the metal, as a preservative, and there is no effective and safe nonmercurial substitute preservative available for use in such cosmetic." (21 C.F.R. § 700.13(d)(2)(ii).)

"ASIN."[5]  His pretrial brief subsequently reduced the list of products at issue to 11, identified by ASIN and name or description:  Three by Faiza, one by Face Fresh, one by Monsepa, and six by Meiyong.[6]

Lee had laboratory tests performed on samples of these products purchased from Amazon, which found 15,000 ppm mercury in a sample of Monsepa Express Peeling cream (ASIN B0030K8GJY) tested in 2017, 9,600 ppm of mercury in a sample of Faiza Beauty cream (ASIN B00WORM8R0) tested in 2016, 5,600 ppm of mercury, in a sample of Face Fresh Beauty cream (ASIN B00ZP38YQY) tested in 2015, 21,000 ppm of mercury in a sample of Meiyong Seaweed Super Whitening cream (ASIN B00CVJKBDE) tested in January 2015, and 2,000 ppm of mercury in another sample of Meiyong Seaweed Super Whitening cream (ASIN B008XRYQUM) tested in September 2015.

Several samples of Monsepa creams (not purchased from Amazon) had previously been tested for California agencies:  Tests performed for the

---

[5] The ASIN is an internal code assigned by Amazon to each unique product listed on the Web site.

[6] The 11 products were:  "Original Faiza Beauty Cream Whitening Cream Anti Pimple Cream Freckle Cream" (ASIN B00WORM8R0), "Faiza Beauty Cream/To Remove Freckles & Dark Spots" (ASIN B00V0LHLTM), "Faiza Beauty Cream – 30 gram – Whitening Cream - Anti Pimple Cream – Freckle Cream" (ASIN B00XUY6FL6), "Face Fresh Beauty Cream" (ASIN B00ZP38YQY), "Monsepa Express Peeling Remove Dark Sports Face Cream" (ASIN B0030K8GJY), "Meiyong Super Extra Whitening Cream Seaweed Face Lift Natural Algae" (ASIN B00CVJKBDE), "Seaweed Cream – Extra Whitening & Face Lift" (ASIN B008XRYQUM), "Meiyong Seaweed Extra Whitening Formula & Face Lift Cream" (ASIN B00AS71WWU); "Seaweed Cream – Extra Whitening & Facelift" (ASIN B00UPXPMYQ), "Meiyong Brand Super Extra Whitening Cream Seaweed Face lift" (ASIN B00VCN3Z7Y), and "Meiyong Super White Cream Extra Whitening & Face Life Advanced Super Revitalizer" (ASIN B00HZFSBYU).

California Department of Public Health (CDPH) found 8,900 ppm mercury in a sample of Monsepa Express Peeling cream tested in May 2013, 13,000 ppm mercury in a sample of Monsepa Express Peeling cream tested in December 2013, and a 2013 test for the California Department of Justice found 12,000 ppm mercury in a sample of Monsepa Express Peeling cream and 20,000 ppm mercury in a sample of Monsepa Whitening Peel.

Additionally, in 2013, the European Union's Rapid Alert System for dangerous non-food products (RAPEX) issued two alerts for Faiza Beauty Cream, one reporting 5,430 ppm mercury and the other reporting 5,940 ppm mercury, and an alert for Face Fresh Beauty Cream reporting 4,620 ppm mercury.

The CDPH issued a health risk warning on January 14, 2014, for certain imported skin-lightening creams that had been found to contain high levels of mercury, including "Monsepa Bleaching Express Peeling."

Lee provided Amazon a 60-day "Notice of Violation" pursuant to Proposition 65 (Health & Saf. Code, § 25249.7, subd. (d)) dated May 22, 2014. He filed his complaint for civil penalties and injunctive relief on August 25, 2014.

After a bench trial in January 2019, the trial court ruled in favor of Amazon, finding the company immune from liability under section 230 of the federal CDA (47 U.S.C. § 230).[7] The court also found that while Amazon could have a duty to warn under Proposition 65 for third-party sales of the products at issue, Lee failed to prove each element of his claim under Proposition 65—specifically, that Lee did not prove each of the products at issue contained mercury, that test results finding mercury in a unit of the products at issue should be generalized to other units of that product or

_____

[7] Further references to "section 230" are to title 47 United States Code.

similar products, that the creams sold on Amazon's Web site were actually used by consumers, and that Amazon had actual knowledge the products contained mercury at the time they were purchased without a Proposition 65 warning.

***Mercury in Skin-Lightening Creams***

As described by Lee's expert witness on mercury in skin-whitening creams and resultant health risks, Dr. Gina Solomon,[8] mercury exists in three forms (elemental, inorganic and organic), all of which are toxic, with serious effects on bodily systems and organs at a cellular level.  Inorganic mercury (the form used in skin creams) is "very, very toxic" to kidney function and also has serious effects on reproductive function and fetal development.  Animal studies consistently show reduced fertility, fetal viability and birth weights at "pretty low level exposures." In both humans and rodents, prenatal exposure at "pretty low levels" has been shown to result in profound deafness.  Solomon testified that the levels of mercury found in skin creams are in the same range as those shown to cause these

[8] Dr. Solomon was a principal investigator at the Public Health Institute and clinical professor in the Division of Occupational Environmental Medicine at the University of California San Francisco.  Her background included serving as the deputy secretary for the California Environmental Protection Agency, where her work included developing sampling plans for hazardous material cleanup, including work with metals such as lead, mercury and arsenic, and extensive work with OEHHA on Proposition 65 issues; teaching medical students, residents and fellows, and supervising them on clinical work regarding complex toxicology issues; teaching continuing medical education classes for doctors and developing the original curriculum for a CDPH program for physicians on the human health effects of mercury; and treating patients exposed to dangerous levels of mercury from a skin cream product and collaborating with researchers investigating the case, which led to the CDPH's health alert on mercury in skin-lightening creams, as well as work on the issue with other states' health departments.

adverse effects in rodents, which tend to be less sensitive than humans to many neurologic and reproductive effects.

The adverse effects of mercury are not limited to the direct users of the creams. The form of mercury used in skin-lightening creams—inorganic mercury—can release mercury vapor, especially in warm conditions.[9] The CDPH has found mercury contamination resulting from use of skin creams requiring extensive decontamination of houses, including items such as washing machines, mattresses and sofas, and disposal of items like toys, towels, and bedding as hazardous waste. In the case of a family Solomon treated for mercury poisoning, mercury vapor was found emanating from the hands of the woman who used the cream, and decontamination of her hands took a month of repeated applications of a binding compound.

The primary users of skin-lightening creams are women, principally women of color. At the time of trial, the CDPH was conducting educational events in communities where the creams are known to be used, as well as a buyback program for people to return the creams and receive money to purchase substitutes.

Not all skin-lightening creams contain mercury: CDPH tests of more than 100 skin-lightening creams found seven that were positive for mercury.[10] Of a total of five ingredients known to whiten skin, the only one permitted in the United States is hydroquinone.

---

[9] Solomon explained that mercury exists in three different forms (elemental, inorganic and organic), which have different properties, but can "inter-covert" in different settings.

[10] None of the products tested in this study came from Amazon. The CDPH witness who testified at trial explained that they were collected from markets in targeted communities and online stores serving immigrant populations identified in the literature, or through poisoning investigations, as using these creams.

Solomon testified that public health issues with skin-whitening creams involve creams imported from certain countries in Asia, Mexico, and in a few cases Africa; Lee's expert witness on cosmetic chemistry and Proposition 65 warnings, David Steinberg,[11] testified that in his experience most skin-bleaching products containing mercury were made in Pakistan. Both testified that the claims made on listings on Amazon for the products Lee had tested—referring to removing dark spots, whitening skin and treating acne[12]—were "red flags" indicating the product was for skin bleaching and

---

[11] Steinberg was the president of a consulting company that deals with "regulations and chemistry of cosmetics and topical pharmaceutical products." His 50 years' experience in the cosmetic industry included working on product development involving the chemistry of cosmetics, advising cosmetics companies on product and regulatory issues, teaching and publishing on the chemistry of cosmetics, and lecturing on quality assurance for cosmetics; he had experience with mercury in cosmetics and specifically in skin-lightening products, and with issues under Proposition 65.

[12] On the Amazon Web site, a listing for "Faiza Beauty Cream" (ASIN B00V0LHLTM) claims to "remove freckles & dark spots"; another—with the same product image, but a different ASIN (B00WORM8R0) and different Universal Product Code claims to be "the only cream that cleans pimples, wrinkles, marks, hives even dark circles under the eyes and turns your skin white." The product listing for "Meiyong Super Extra Whitening Cream Seaweed Face life natural Algae" (ASIN B00CVJKBDE) includes "Help relieve acne, freckles and dark spots on the performance give a white skin." Monsepa Express Peeling Remove Dark Spots Face Cream (ASIN B0030K8GJY) claims it "eventually removes even the deepest types of freckles, dark spots, butterfly spatches and yellow spots from your face" and "is specially effective to eradicate and even out acne scars." Face Fresh Beauty Cream's (ASIN B00ZP38YQY) claims include, "Best whitening cream," "Anti Wrinkles," "lightening dark spots," and "Turns Your Skin White."

might contain mercury.[13]  This was particularly the case where a product claimed to both whiten skin and treat acne, because mercury is the only ingredient known to do both.

Solomon testified that the mercury concentrations found in the creams tested in this case meant mercury was "definitely not" a "trace amount," but rather an intentionally added active ingredient; the concentrations were "absolutely inconsistent" with mercury being a trace contaminant.  The range of concentrations in the tested samples, between 2,000 and 21,000 milligrams per kilogram (2,000 to 21,000 ppm or .2 to 2 percent), was consistent with active ingredients in other consumer products, such as 2 percent of the herbicide in RoundUp, 1 percent cortisone in anti-inflammatory skin cream or .2 percent sodium fluoride in toothpaste.  Prior to her work on this case, Solomon had seen the 2014 CDPH press release warning consumers about mercury in certain skin-lightening creams, including Monsepa, and believed the product contained mercury because she considered product warnings from the CDPH highly credible; the test results Lee obtained in 2017 confirmed her opinion and showed the formula had not been changed despite the health alert.

Based on the test results and language used in the Amazon listings for the skin whitening creams, Solomon was certain all units of the products tested would contain mercury.  Solomon testified that "very little actual testing" is necessary to answer the "yes or no" question whether an intentionally added ingredient is present in a product, and regulatory agencies "not infrequently" base a decision on a single sample or very few

---

[13] Amazon stipulated that all 27 products identified in the second amended complaint purported to be skin-lightening or skin-bleaching products.

samples.  Factors such as how a product was stored and whether multiple manufacturers were used, could be relevant to a contamination issue, but would be irrelevant in determining whether an intentional ingredient was present because manufacturers are reluctant to change their formulas:  They want consistency in the appearance, smell, and effect of consumer products, as consumers notice differences and do not like them.  Solomon was careful to clarify that extrapolation from test results on one unit to other units of the same product was appropriate for "yes/no test results" for presence of mercury, not the exact concentrations detected.

Steinberg similarly testified that the test results in evidence were sufficient to conclude the products at issue contained mercury because there was no way the amount of mercury found in samples Lee had tested could be due to a trace contaminant that might vary between batches or lots; it had to be a deliberately added ingredient  He testified that in making emulsions (the form of the skin creams at issue), at least three or four tests are usually run per batch for purposes of quality control and quality assurance, to ensure uniformity and confirm the product meets specifications and is free of contamination, and most companies test each batch before filling individual containers for consumer sales.  Testing of multiple batches of each product is not necessary to determine whether mercury is an ingredient in a cosmetic product, however, because at levels seen in this case, it has to have been deliberately added.  The high levels of mercury found in the five samples Lee had tested, together with the products' claims of skin whitening as the intended use, made Steinberg "very, very certain" other batches or lots of the same product would all contain mercury as an ingredient."

Steinberg acknowledged the possibility there could be variations in the chemical makeup of the products between batches; that he did not have

information about the companies' specific manufacturing and packaging practices or know details such as when they began using mercury in their skin-bleaching products or whether they had another version of the product that used a different ingredient in place of mercury; and that some companies use different formulas in different countries for products branded and sold as the same product. He testified that if a company does not follow "current good manufacturing procedures" (cGMPs), which include matters such as manufacturing and testing methods and meeting product specifications, "all bets are off in terms of product consistency across units and batches and lots," and many variables could make a difference in this regard. Steinberg did not know whether the companies here followed cGMPs, but he had reason to believe the products were sourced in Pakistan and no reason to expect companies in Pakistan to follow cGMPs.

Nevertheless, Steinberg testified he could be "very certain" the products tested here contained mercury without analyzing every package because "cosmetic-like products" are manufactured in "larger amounts" with "a consistent formulation," mercury is the active ingredient, and cosmetic companies do not like to change formulations of creams "unless it's absolutely mandatory, or marketing just absolutely demands it, because it's very time-consuming" and a significant added expense. A different chemical could not simply be substituted for mercury; the product would have to be "totally reformulate[d]" because the emulsion would not be stable.

Steinberg was shown a customer comment on the product page for the Monsepa cream Lee had tested saying the news had reported on January 9, 2014, that the product contained high levels of mercury, providing a link to the official alert on the CDPH Web site, and asking vendors to stop selling

11

it.[14] Steinberg testified he would advise a company that received a comment like this to immediately find out if there was mercury in the product. He further testified that as part of good business practices, it is important for a company offering cosmetics for sale on the Internet to monitor public health alerts and announcements by governmental agencies. His advice to a client that received the May 22, 2014, notice of violation Lee sent to Amazon would be to confirm whether the product it was manufacturing or selling contained mercury and, if so, recall the product and notify the FDA. Once Amazon was alerted to the presence of mercury in the creams, it should have immediately notified every purchaser of the product to discontinue use and halted sales of the product.

Dr. Patrick Sheehan, Amazon's expert witness on risk assessment and evaluation of health risks from chemical exposures,[15] agreed that mercury is a known ingredient in skin-lightening creams and that in each of the tested samples in this case, mercury was an ingredient, not a contaminate. He

---

[14] The comment expressed skepticism that the product was made in France (as was also stated on the bottle and packaging of the sample Lee had tested) because "the EU has strict cosmetic regulations." Steinberg had "serious doubt" the product was made in France based on his experience dealing with officials in France, who would not have permitted it, and his knowledge that "these types of products using these types of ingredients . . . have been restricted almost exclusively to Pakistan."

[15] Dr. Sheehan had worked in the field of risk assessment for 40 years, the last 19 of which he had been a consultant with a company called Exponent, advising clients on historic, current, and potential exposures and associated risks. He had taught part of a course on risk assessment at San Diego State University School of Public Health for about 20 years, worked with governmental committees on developing and defining methods to assess health risks, done more than 200 Proposition 65 risk assessments, and had experience evaluating mercury exposure in the contexts of site risk assessment, waste disposal, and a project involving removal of gas pressure regulators from homes.

testified, however, that these results could not be generalized beyond the units tested. Sheehan testified that test results from a single unit cannot be extrapolated even to other units in a batch because it is necessary to account for variability between units resulting from uneven distribution of chemicals within a batch, or between batches for products. Factors influencing variability include changes in ingredients or sources of the ingredients, changes or inconsistency in manufacturing processes and changes in the recipe for the product. Sheehan testified that the standard practice is to sample individual units within a batch to "understand the conditions of the individuals that make up that batch," then "do the same thing in all of the batches that are of interest within the time frame of the evaluation so that you can say with confidence what is a condition of the population that is made up of all of those batches of individuals within those batches."

According to Sheehan, the literature on skin-lightening creams reflects variability as to measurable added mercury, with some batches having no detectable mercury and others having levels "related to added mercury." Asked about the CDPH investigation in which seven of 120 samples of skin-lightening creams tested positive for significant amounts of mercury, Sheehan testified the data suggested there would be detectable added levels of mercury in relatively few skin creams. He disagreed with Steinberg and Solomon because they only evaluated the individual units tested, with no effort to "assess variability among batches or among products." Asked if they followed "appropriate scientific method," Sheehan testified, "I don't believe they followed any method. They made some assumptions. So no, they did not follow any sort of standard method for characterizing variability within a product."

Sheehan stated that Steinberg's "assumption" that "under good manufacturing practice one would expect to find mercury in different batches, if you found it in one batch" was not supported by the data and literature, which contain "examples where there was mercury detected at some batches of a lot and not in others." In Sheehan's view, it did not make any difference that mercury was an added ingredient in the skin-lightening creams for the same reason: The literature indicated that "any measurement in one batch . . . will not tell you what is happening within the population of that skin-lightening cream."

Sheehan acknowledged that a study he conducted on whether users of talcum powder in the 1960's and 1970's were exposed to asbestos was based on analysis of five individual containers, each a different product. He also acknowledged that at his deposition he did not recall having worked on a cream applied to the body other than sunscreen, which he declined to answer questions about, and that he had never previously been an expert in a case involving mercury and skin-lightening cream, advised a client regarding mercury in skin-lightening creams, done any work evaluating the presence or absence of mercury in cosmetics, or otherwise had experience with analyzing heavy metal exposure in creams.

### Amazon's Marketplace

As described by Christopher Poad, Director of Amazon Business International, Amazon both sells products directly to customers through its "Amazon Retail" business and operates a "marketplace" through which third-party sellers sell products to customers. Approximately 2.5 million third parties list and sell approximately 600 million unique products on the Amazon Web site. In 2018, the total value of products sold on the Amazon

14

Web site worldwide was approximately $300 to $350 billion, 50 to 55 percent of which ($150 to $175 billion) were sales by third parties.

Amazon provides third-party sellers with the ability to list their product for sale, provide a title, description and image for the listing, and have Amazon collect payment on the sellers' behalf. Sellers can choose to fulfill orders themselves, making their own arrangements for warehousing and shipping, or use Amazon's "Fulfillment by Amazon" or "FBA" service. With FBA, the third-party seller's products are stored in an Amazon fulfillment center (warehouse), then shipped to the customer by Amazon when the seller makes a sale. For third-party sales, ownership of the product is transferred from the seller to the customer without Amazon taking title. By contrast, for Amazon Retail, Amazon purchases the merchandise from a supplier, owns it, and then resells it to the customer.

The products at issue in this case were all placed on the Amazon Web site by third-party sellers, and at least one used the FBA service.

Third-party sellers are required to consent to Amazon's "Business Solutions Agreement," which details matters including indemnification and insurance requirements for sellers. Amazon charges fees to sell products on the marketplace, which it earns when the seller completes a sale and the product is shipped to the customer. Customers use the Amazon Web site to complete purchases and in most transactions, there is no communication between customers and third-party sellers; if there is, it goes through the Amazon platform. Amazon's Web site does not provide contact information for third-party sellers; it offers a "contact seller" option through which a customer can send a message, which Amazon forwards to the seller, and the seller can respond.

15

Each unique product on the Amazon Web site has its own product description page. The content for this page, including product name, description, price, and quantity available for sale, is provided by the third-party seller. When a third party creates a new product listing, if the product does not already exist on the Web site, it is assigned a new ASIN. Materials for sellers "encourage and require" them not to create duplicate listings and it is not in their interest to do so, because if there are two pages for a single product, each will only get half as many people looking at it. Amazon has software that scans the product catalog for products that look identical, or "very, very similar," and merges such products onto a single page, and the customer service team is able to merge pages together if someone reports duplicates. According to Poad, it is not sufficient to look at product images to determine whether two are the same because manufacturers may change the contents without changing packaging and many use stock images for multiple products; instead, one must look at unique identifiers such as the Uniform Product Code, descriptions and titles.

During the process for setting up the product description page, sellers "have the ability to flag whether the product they are selling requires a Proposition 65 warning for California residents," and if they select this option, a warning is displayed on the product description page that links to a page in the customer help section of the Web site. In its "policies and agreements" for sellers, Amazon provides a list of examples of "prohibited listings" that includes "Products and ingredients that the [FDA] has determined present an unreasonable risk of injury or illness, or are otherwise unsafe, such as . . . [s]kin creams containing mercury."

Amazon's director of worldwide product compliance and safety, David Kosnoff, testified in his deposition that the Amazon product safety team in

16

Europe reviews products listed on RAPEX notifications and these products are removed from Amazon's European Web sites, but not necessarily those in other countries. If a product was listed on RAPEX in 2015, Amazon would have searched its European Web sites and, if the product was listed, would have taken down the listing and notified customers; the United States marketplace would not have been impacted. A recall in one country would not necessarily trigger recall in another because it can be difficult to determine whether products that appear identical in different countries are actually the same product.

Kosnoff testified Amazon would have been aware of the 2013 RAPEX notification for Faiza Beauty Cream. He did not know whether the product was listed on Amazon's European Web sites. He was aware a "very similar" product was listed on the United States Web site and did not believe any action would have been taken to notify the United States marketplace of the European recall. The record documents sales of Faiza Beauty Cream on the Amazon Web site through late 2015.

Face Fresh, which was also the subject of a 2013 RAPEX notification, was being sold on Amazon's Web site as of January 16, 2019.

After Lee's May 22, 2014, 60-day notice of violation, which listed Monsepa Express Peeling Night Face Cream as an example of "[s]kin-lightening creams," on June 11, 2014, Amazon added a Proposition 65 warning to the listing for Monsepa Express Peeling cream (ASIN B0030K8GJY). Between these dates, there were five sales of this product (May 23, 29, 31, June 2, 6). Amazon removed the listing from the Web site on August 12, 2014.

## DISCUSSION

We begin with the elements of the Proposition 65 claim because, as will be seen, the nature of this claim is critical to the question of immunity under section 230 of the CDA.

### I.

The trial court found Lee did not prove that each of the 27 products identified in the second amended complaint contained mercury because Lee purchased and tested only one unit each of five products.[16]  The court concluded the product detail pages from Amazon's Web site that Lee introduced into evidence did not establish the 27 products originally identified were the same products he tested because the pages were for only a few products and contained "multiple material differences, including different "product names, pictures, sellers, descriptions, ASINs and UPCs."  The court therefore limited Lee's claims to "the four products he purchased on Amazon and tested."

Moreover, the court found Lee did not prove the test results showing mercury in one unit of a given product should be generalized to other units of that product or similarly named ones because Lee did not introduce evidence of "how, when, where or by whom any of the tested units were manufactured, filled, stored, or distributed, including any lot or batch information for the tested samples," leaving no scientific or evidentiary basis for determining whether other units of the same product or similar ones under the same

---

[16] The trial court referred to Lee having tested four products purchased from Amazon's Web site, plus one unit of a fifth product purchased on www.aztopsel.com.  As we understand the record, the five samples Lee had tested for this case were each from a product with a distinct ASIN, purchased on Amazon's Web site, although the two Meiyong products had the same product name and the Monsepa product was shipped from aztopsel.com.

18

brand name contained mercury. The court pointed to a comment on the laboratory report for one of the samples Lee had tested, which stated, "Please note that these results apply only to the sample(s) submitted for this report. Samples from a different portion of the same lot may produce different results." The court also observed that the RAPEX notices identified batch numbers for the product involved. The court rejected the opinions of Lee's expert witnesses that the test results Lee obtained could be generalized to untested units, finding them contradicted by the testimony of Amazon's expert witness and two of Lee's own witnesses.

Lee argues the trial court's conclusions are both legally and factually unsupported. Preliminarily, he points out that the trial court ignored his narrowing of the products at issue from the 27 identified by ASIN in the second amended complaint to four products appearing under 11 ASINs on Amazon's Web site, and argues the trial court erred in limiting the case to four ASINs for which laboratory tests were obtained. More fundamentally, he argues the trial court erred in concluding test results for one unit of a given product could not be extrapolated to other units of the same product for purposes of determining whether Proposition 65 warnings were required.

Amazon treats these issues as purely factual, to be reviewed under the substantial evidence test. Focusing on descriptions of this test as requiring us to "look only to the evidence supporting the prevailing party" and "discard evidence unfavorable to the prevailing party" (*Felgenhauer v. Soni* (2004) 121 Cal.App.4th 445, 449), Amazon argues the court's conclusions were supported by its witnesses' testimony—Poad's, as to each ASIN representing a distinct product, and Sheehan's (along with Steinberg's and Dr. Brian Lee's) as to a test of one unit being insufficient to demonstrate the presence of mercury in another unit of the same product.

19

To the extent these issues are purely factual, Amazon is of course correct that we review the trial court's decision under the substantial evidence test. " 'In determining whether a judgment is supported by substantial evidence, we may not confine our consideration to isolated bits of evidence, but must view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court. (*People v. Johnson* (1980) 26 Cal.3d 557, 576–578.) We may not substitute our view of the correct findings for those of the trial court; rather, we must accept any reasonable interpretation of the evidence which supports the trial court's decision.' " (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336, quoting *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1203–1204.) Nevertheless, we do not defer to the trial court's decision entirely. (*DiMartino*, at p. 336.) "Substantial evidence is a deferential standard, but it is not toothless." (*In re I.C.* (2018) 4 Cal.5th 869, 892.) " ' "We may not uphold a finding based on inherently improbable evidence or evidence that is irrelevant to the issues before us. [Citation.]" [Citation.]' (*Richardson v. City and County of San Francisco Police Com.* (2013) 214 Cal.App.4th 671, 692.)" (*Daugherty v. City and County of San Francisco* (2018) 24 Cal.App.5th 928, 944.)

In particular, "expert testimony does not constitute substantial evidence when based on conclusions or assumptions not supported by evidence in the record (*Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1137), or upon matters not reasonably relied upon by other experts (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135). Further, an expert's opinion testimony does not achieve the dignity of substantial evidence where the expert bases his or her

conclusion on speculative, remote, or conjectural factors.  (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 487.)  When the trial court accepts an expert's ultimate conclusion without critically considering his or her reasoning, and it appears the conclusion was based on improper or unwarranted matters, we must reverse the judgment for lack of substantial evidence.  (*Pacific Gas & Electric Co.* [at p.] 1136.)  On the other hand, the trial court is free to reject testimony of a party's expert, so long as the trier does not do so arbitrarily.  (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 633.)"  (*People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1567–1568.)

We turn first to the trial court's conclusion that a laboratory test finding a high level of mercury in one unit of a skin-lightening cream is an insufficient basis for concluding other units of the same product contain mercury.  All the relevant experts—Steinberg, Solomon, and Sheehan— agreed that because of potential variability in factors such as ingredients, supply sources, manufacturing processes, and storage conditions, multiple samples would have to be tested to ensure consistency of a product within a batch and across multiple batches.  Such testing would be necessary, all agreed, to determine matters such as the *amount* of an intentional ingredient or presence of a contaminant.

The question in the present case, however, is whether the test results for one unit of a product could be sufficient to determine whether mercury was *present* in other units—not whether any specific amount was present, just whether it was present at all.  Lee's experts testified that answering this "yes/no" question did not require testing more than one unit of each product, or considering variables such as manufacturing and packaging procedures, because the amount of mercury in the unit tested was so high that it

21

demonstrated mercury was the intentionally added active ingredient—the ingredient used to achieve the product's intended purpose. Because it was the active ingredient, while there might be variation in the actual concentration of mercury from one unit or batch to another, there would not be units in which mercury was completely absent. Significantly, Sheehan, too, agreed that the levels of mercury found in the tested samples indicated it was an intentional ingredient, not a contaminant.

In rejecting Solomon's and Steinberg's conclusions as to generalizing the test results, the trial court first cited the deposition testimony of Dr. Brian Lee, who Lee had identified as an expert witness but did not present as a witness at trial, that "there is insufficient information to conclude that any untested unit contains mercury."

Dr. Lee testified at his deposition that his only assignment for this case was to determine "how much an exposure might occur to users." Asked whether he would be offering an opinion that any unit of a product at issue in the case contained mercury other than the 11 samples for which he was given lab test results, Dr. Lee first clarified that the questioner meant "all of the other units that are on the market," then responded, "No. I only know what is in these products. These may represent what's in the other products, but until you actually test what is in the products, there could be several batches."

The trial court's summary of Dr. Lee's deposition testimony makes it appear more definitive than it actually was. The questioner explained he was asking about "units" of a product, not "product," but Dr. Lee's response referred to "products," suggesting he was saying the products tested might or might not represent other products, not necessarily that one unit of a given product might or might not represent other units of that product (although

22

his references to "batches" creates some ambiguity). Moreover, especially in light of his assignment to determine "how much an exposure might occur to users," the deposition excerpt read into the record at trial does not make clear whether Dr. Lee understood the question as asking about absolute presence or absence of mercury across units of a given product or about potential variability in the amount of mercury in one unit as compared to another, or whether he considered the significance, if any, of mercury being the active ingredient in the creams.

Dr. Sheehan was expressly asked whether it made any difference to him that mercury was an intentionally added ingredient and testified that it did not. His response, while not entirely clear, appears to concern variability among batches without explaining how variability would extend to complete absence of the product's active ingredient.[17] The trial court summarized Dr. Sheehan's testimony as stating that "there is variation in the mercury content of skin-lightening creams, even when one expects to find mercury, and that a scientific method is needed to generalize from one unit to other units and other batches." But as far as we are aware, Dr. Sheehan did not explain why this is so in the case of a product intended to address cosmetic issues for which mercury is an effective treatment and demonstrated—albeit in one or a small number of samples—to contain such high levels of mercury that it must be an intentional ingredient.

---

[17] Dr. Sheehan responded, "For the same general reason that I gave for the other, that is if you look at the literature, is if you find in one batch no skin-lightening creams and in another batch, you find some measurable added level of skin-lightening creams, it suggests that any measurement in one batch. It will not tell you what is happening within the population of that skin-lightening cream."

The portions of Steinberg's testimony that the trial court saw as contradicting his own and Solomon's testimony that the test results could be generalized to the product line from which the sample was taken are not, in fact contradictory. The court noted Steinberg's testimony that "at least three or four tests per batch would be needed to ensure uniformity of a cosmetic product," that in order to predict consistency across units and batches, it is necessary to know whether a product was manufactured according to current cGMPs, and that, in effect, he did not expect cGMPs were followed for the products at issue. This testimony, however, addressed uniformity and consistency of the product. Steinberg expressly distinguished the testing necessary to ensure uniformity and consistency from that necessary to determine whether mercury is *present* in units of a specific skin-whitening product other than the unit tested where mercury is known to be the active ingredient in skin-whitening products because of its effectiveness in lightening skin, is the single ingredient known to also treat acne, as advertised for some of the creams at issue, and is found in high concentrations in one or a few samples of that specific skin-lightening product.

Amazon's statement that this is "a rare case where *all experts* on *both sides* agreed that it was not possible to extrapolate test results from a single unit of four products to all other units of that product line" is thus divorced from the record. This was Dr. Sheehan's testimony, but not Dr. Solomon's or Steinberg's; Lee's witnesses both testified that in the circumstances here, the tests *could* be generalized to other units of the product line from which the tested sample was taken.

The trial court also noted that the National Food Lab's report for the samples of Monsepa creams tested for the California Department of Justice

24

in 2013 contained the comment, "Please note that these results apply only to the sample(s) submitted for this report.  Samples from a different portion of the same lot may produce different results."  This comment, again, refers to the undisputed potential for variability in uniformity and consistency across lots.  It does not address the disputed question whether test results finding a high level of the active ingredient in a single sample can be generalized to conclude all samples of that product will have *some* amount of the active ingredient.

Finally, the trial court noted that the RAPEX notices "delineate batch numbers of any product involved within the notice(s)."  The observation is only partially accurate.  The RAPEX notice for Face Fresh Beauty Cream provided information in the spaces for "Type/number of model" and "Batch number/Barcode,"[18] but the RAPEX notice for Faiza No. 1 Beauty Cream, in these spaces, stated "Unknown."  Moreover, the warning issued and report of action taken for both RAPEX notices pertained to "the product," unlimited by batch number or otherwise.  Both notices, for "Risk description," stated that "[t]he product poses a chemical risk because it contains mercury" and "[t]he product does not comply with the Cosmetics directive 76/768/EEC."  Both notices reported the "[m]easures adopted by notifying country" as "Voluntary measures:  Withdrawal of the product from the market."

In sum, the trial court's stated reasons for concluding that a laboratory test finding a high level of mercury in one unit of a skin-lightening cream is an insufficient basis for inferring other units of the same product contain mercury do not withstand scrutiny.  The only evidence directly supporting

---

[18] The RAPEX notice for Face Fresh Beauty Cream, for "Type/number of model," stated, "Unknown Batch number:  No 1192 - MFG 1 3 12 EXP 1 3 14" and for "Batch number/Barcode" stated, "1 41960 001908."

the trial court's conclusion, Dr. Sheehan's testimony, failed to explain the basis for his rejection of the other experts' distinction between testing to determine uniformity and consistency of a product and testing to confirm the absolute presence or absence of the active ingredient in a product. Indeed, Dr. Sheehan's testimony on this point was inconsistent with the design of his own investigation of asbestos in talcum powder. Dr. Sheehan acknowledged that a study he conducted on whether users of talcum powder in the 1960's and 1970's were exposed to asbestos reported on the health risk from using talcum powder during that period based on analysis of five individual containers, each a different product. These five samples of five different products were the basis for what appears to be a broad conclusion in an article published in the peer-reviewed scientific literature that "[t]he absence of detectable asbestos fibers confirms the previous findings that most historical cosmetic talcum powder products did not produce asbestos fiber exposures." Additionally, while Solomon and Steinberg both had considerable experience with the specific subject of testing here—mercury in skin-lightening creams—Sheehan did not recall having worked on a cream applied to the body other than sunscreen and had no experience with mercury in cosmetics or heavy metals in creams.

Dr. Sheehan's testimony is also difficult to reconcile with the practice of governmental entities responsible for regulating harmful consumer products. A CDPH employee who helped write the January 2014 news release warning against use of certain skin-lightening creams testified that the sample of Monsepa Express Peeling cream that was the basis for the alert did not have batch or lot numbers or other such identifying information and the alert was issued "for any and all products that have this appearance in name." Dr. Solomon testified that "it's something regulatory agencies not

26

infrequently will do based on a single sample or very few samples." This makes obvious sense where the issue is whether a product contains the chemical in question *at all*, and not the precise amount in any individual unit.

Proposition 65 imposes a duty to warn based on presence of a listed chemical in a product, without requiring uniformity across individual units in the precise amount of the chemical in a given unit. When the chemical at issue is the product's active ingredient, its complete absence in an individual unit would be fortuitous. "Proposition 65 is a 'right to know' statute requiring companies that expose consumers to carcinogens or reproductive toxins to provide a reasonable and clear warning. (Health & Saf. Code, § 25249.6.) It is a remedial law, designed to protect the public, and thus we construe its provisions broadly to accomplish that protective purpose. (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 314.)" (*Center for Self-Improvement & Community Development v. Lennar Corp.* (2009) 173 Cal.App.4th 1543, 1550–1551.) Once it is confirmed that a product contains a high level of a chemical listed as a toxin under Proposition 65 as an intentional ingredient (not as a contaminant), it would be inconsistent with the statutory purpose to require the kind of testing necessary to ensure product uniformity or consistency before enforcing the duty to warn.

Amazon's assertion that there was no evidence mercury was an intentional ingredient in these products is without basis in the record and directly inconsistent with even its own expert's testimony: Sheehan fully agreed that mercury was present in the samples tested in amounts demonstrating it was an ingredient, not a contaminant. Amazon points to the CDPH testing that found most skin-lightening creams on the California market did not contain mercury, but that does not refute the undisputed

27

evidence that the products at issue here tested positive for mercury, at very high levels.

Given the undisputed evidence that samples of five skin-lightening products purchased on Amazon's Web site contained high levels of mercury as an intentionally added ingredient, there is no basis for a conclusion that Lee failed to prove this element of his case with respect to these products, at a minimum. If Lee proved the other elements of his claim, it cannot be rejected—at least for these specific products—on the ground that he failed to prove the products contained mercury.

Beyond the products tested, a question remains. The trial court concluded Lee did not prove each of the 27 products listed by ASIN in the second amended complaint contained mercury because the evidence did not establish that they were the same products as the ones[19] tested. Lee subsequently limited his claims to 11 products that he claimed were the same as those tested despite having been assigned different ASINs. Given our rejection of the trial court's conclusion that Lee failed to prove the tested products contained mercury, if the remaining elements of his claims were also established as to these specific products, the trial court will have to determine whether the untested products within the identified group of 11 were in fact the same products as the ones tested.

## II.

As earlier stated, Proposition 65 provides that "[n]o person in the course of doing business shall *knowingly and intentionally* expose any

---

[19] The trial court referred to four products having been tested for this case. As earlier indicated, five samples were tested, one each for the Faiza, Monsepa, and Face Fresh creams, and two for Meiyong skin-lightening creams with the same name but assigned different ASINs on Amazon's Web site.

individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual, except as provided in Section 25249.10." (Health & Saf. Code, § 25249.6, italics added.) Lee argues the trial court erred in requiring him to prove Amazon had actual knowledge that the products at issue contained mercury, maintaining that constructive knowledge is sufficient to trigger the duty to provide Proposition 65 warnings. In general, "[p]roof of actual knowledge focuses on what information a defendant must have been aware of, while proof of constructive knowledge rests on a defendant's duty to discover information." (*People v. ConAgra Grocery Products Co.* (2017) 17 Cal.App.5th 51, 84–85.) "Constructive knowledge" means "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." (Black's Law Dict. (11th ed. 2019) p. 1043, col. 1; *Castillo v. Toll Bros., Inc.* (2011) 197 Cal.App.4th 1172, 1197.)

Proposition 65 does not define the term "knowingly." (See Health & Saf. Code, § 25249.11 ["Definitions"].) The regulations define the term as follows: " 'Knowingly' refers only to knowledge of the fact that a discharge of, release of, or exposure to a chemical listed pursuant to Section 25249.8(a) of the Act is occurring. No knowledge that the discharge, release or exposure is unlawful is required. However, a person in the course of doing business who, through misfortune or accident and without evil design, intention or negligence, commits an act or omits to do something which results in a discharge, release or exposure has not violated [Health and Safety Code] Section 25249.5 or 25249.6 of the Act." (Regs., §§ 25102, subd. (n), 25600.1, subd. (h).) Neither Proposition 65 nor the regulations use the phrase "constructive knowledge" or language commonly associated with the concept,

29

such as "should know" or "reason to know." Nor do Proposition 65 or the regulations applicable to this case use the phrase "actual knowledge."[20]

The trial court provided little explanation of its determination that Proposition 65 requires proof of actual knowledge. In granting Amazon's motion in limine to exclude evidence of constructive knowledge, the court cited the "statute itself" and "the nature of the Prop 65 process including the notice aspects." In its statement of decision, the court stated, "Proposition 65 and its terms apply only to 'businesses that know they are putting one of the chemicals into the environment.' (*See Nicolle-Wagner v. Deukmejian* (1991) 230 Cal.App.3d 652, 659 [quoting with approval language from ballot argument in favor of Proposition 65].)"

*Nicolle-Wagner v. Deukmejian, supra,* 230 Cal.App.3d 652 (*Nicolle-Wagner*) was not concerned with the nature of the knowledge requirement in Proposition 65 and does not discuss any distinction between actual and constructive knowledge. The question in that case was whether Proposition 65 was intended to apply to naturally occurring carcinogens and reproductive toxins in food. Holding it was not, the court described the statutory language and ballot arguments for and against Proposition 65 as indicating the measure "sought to regulate toxic substances which are deliberately added or put into the environment by human activity. . . . [¶] . . . . [T]he ballot argument in favor of Proposition 65 explains that '[Proposition 65] will not take anyone by surprise. [It] applies only to businesses that *know* they are putting one of the chemicals out into the environment . . . .' (Italics in original.)" (*Nicolle-Wagner,* at p. 659.) While the emphasis on "know," in

---

[20] As will be further discussed, a regulation adopted subsequent to the sales of the products at issue in this case refers to "actual knowledge" in limiting the situations in which retail sellers are required to provide warnings. (Regs., § 25600.2, subd. (e).)

context, might naturally be understood by a layperson as implying actual knowledge, in legal terms " 'knowledge' encompasses both actual knowledge *and* constructive knowledge." (*Tsasu LLC v. U.S. Bank Trust, N.A.* (2021) 62 Cal.App.5th 704, 718 (*Tsasu*).)[21]

Lee relies heavily on a 1988 agency interpretation of the statutory "knowingly and intentionally" language as including constructive knowledge.[22] "An administrative agency has the power to adopt regulations to effectuate the statutory purpose, provided the regulations are not in conflict with applicable statutes. (*Woods v. Superior Court* (1981) 28 Cal.3d

---

[21] The *Tsasu* court was called upon to determine whether the term "knowledge" in a provision of the Quiet Title Act meant solely actual knowledge or included constructive knowledge as well. Its first reason for adopting the later interpretation was that inclusion of constructive knowledge was "the result dictated by the statute's plain language. ([Citation]. [Civ. Code,] § 764.060 uses the term 'knowledge,' and 'knowledge' encompasses both actual knowledge *and* constructive knowledge. [Citations].)" (*Tsasu, supra,* 62 Cal.App.5th at p. 718.)

[22] Lee also relies on the provisions in the regulation defining "knowingly" that "[n]o knowledge that the discharge, release or exposure is unlawful is required" and "a person in the course of doing business who, through misfortune or accident and without evil design, intention or negligence, commits an act or omits to do something which results in a discharge, release or exposure has not violated [Health and Safety Code] Section 25249.5 or 25249.6 of the Act." (Regs., §§ 25102, subd. (n), 25600.1, subd. (h).) Lee observes that this regulation "contemplates that 'negligence' is actionable," but does not further explain how the definition bears on the question of actual versus constructive knowledge. The inference that constructive knowledge is sufficient if negligence is actionable makes obvious sense where the negligence is with respect to awareness of the presence of a listed chemical in a product (i.e., if the defendant, in the circumstances, should have known the chemical was present and remained ignorant due to negligence, a warning would be required). The inference seems less clear, however, if the negligence is in regard to exposure (e.g., selling the product). In any event, we do not see this point as critical to our analysis.

31

668, 679; *Nicolle–Wagner, supra,* 230 Cal.App.3d [at p.] 658.) We defer to the technical skill and expertise of the administrative agency in interpreting the statutes. (*Ibid.*)" (*Mission Community Hospital v. Kizer* (1993) 13 Cal.App.4th 1683, 1691.)

The agency initially responsible for implementing Proposition 65,[23] in its November 1988 Revised Final Statement of Reasons for what was then section 12601 of title 22 (now tit. 27, § 25601) of the California Code of Regulations, interpreted the Proposition 65 requirement that exposures be "knowing and intentional" before a warning is required "to include exposures about which there is constructive knowledge." (OEHHA, Revised Final Statement of Reasons, 22 California Code of Regulations, Division 2 (Nov. 1988), p. 39 (1988 FSOR).)

Amazon points out that this section of the 1988 FSOR was discussing environmental exposures, which are distinct from consumer product exposures. But the agency's statement about constructive knowledge was not limited to environmental exposures. While it happened to be made in a section discussing environmental exposures, as it was responding to a comment about the definition of such exposures, the "knowing and intentional" language applies to all exposures, not just environmental ones.[24]

_____

[23] The Governor originally designated the Health and Welfare Agency as the "lead agency" for Proposition 65, with authority to "adopt and modify regulations, standards, and permits, as necessary, in order to conform with and implement the purposes of the initiative statute." (*Nicolle-Wagner, supra,* 230 Cal.App.3d at p. 655.) The California Environmental Protection Agency's Office of Environmental Health Hazard Assessment (OEHHA) was designated the lead agency for implementation of Proposition 65 in 1995. (Regs., § 25102, subd. (o); Health & Saf. Code, § 25249.12, subd. (a).)

[24] At the time, the regulation defined " 'environmental exposures' as those which may foreseeably occur as the result of contact with an environmental medium . . . ." (1988 FSOR, *supra,* p. 39.) In response to a

32

Other portions of the 1988 FSOR also discuss constructive knowledge, thus making clear that the agency interpretation was not limited as Amazon suggests.[25]

concern that "requiring exposures to be foreseeable detracts from the requirement that exposures be knowing and intentional before a warning is required," the agency explained that it interpreted the "knowing and intentional" requirement to include constructive knowledge and its "[u]se of the term 'foreseeable' is intended to define the limits of that constructive knowledge and of exposures for which businesses can reasonably be held responsible." (*Id.* at pp. 39–40.) The current regulations do not include the terms "foreseeable" or "foreseeably" in the definition of "environmental exposure," providing simply that such exposure means "an exposure that occurs as the result of contact with an environmental source . . . ." (Regs., § 25600.1, subd. (f).) The definition of "consumer product exposure" included "reasonably foreseeable use of a consumer good," and still does. (1988 FSOR, p. 8; Regs., § 25600.1, subd. (e).)

[25] Regarding the statutory phrase "discharge or release into water or onto or into land" in Health and Safety Code section 25249.5, the agency had proposed a regulation regarding liability when a person in the course of doing business transfers a chemical to a person authorized to receive it, which a commentor viewed as an attempt to impose vicarious liability on a transferor who has no control over the transferee. (OEHHA, Final Statement of Reasons, 22 California Code of Regulations, Division 2, Safe Drinking Water and Toxic Enforcement Act of 1983 (R-48-87) § 12101 et seq. (Jan. 1988) p. 26 <https://oehha.ca.gov/media/downloads/crnr/art13fsorjan1988.pdf> [as of Mar. 11, 2022]; see Regs., § 25102, subd. (f).) The agency modified the proposed regulation to provide that "discharge or release" to a source of drinking water includes transfer "for the principal purpose of disposing of the chemical to land or water in a manner which, if committed by the transferor would violate § 25249.5" and explained: "This proposal does not impose vicarious liability for acts over which the transferor has no control. In fact, this provision envisions that the transferor *knows or reasonably should know* that the transferee will make an otherwise prohibited discharge, and can control that behavior simply by not making the transfer. Further, this provision does not conflict with the requirement that discharges or releases prohibited under the Act be committed 'knowingly.' The transferor would still have *actual or constructive knowledge* of the discharge of the listed chemical." (1988 FSOR, p. 27; see Regs., § 25102, subd. (f), italics added.)

Amazon does not expressly argue the agency has disavowed the general interpretation of "knowingly and intentionally" as including constructive knowledge. Instead, it points to a regulation adopted by OEHHA in 2016 which it says "clarif[ies] that 'knowledge' for downstream entities means actual knowledge." As relevant here, Regulations section 25600.2, subdivision (e) provides: "The retail seller is responsible for providing the warning required by Section 25249.6 of the Act for a consumer product exposure only when . . . [¶] . . . [¶] [t]he retail seller has *actual knowledge* of the potential consumer product exposure requiring the warning, and there is no manufacturer, producer, packager, importer, supplier, or distributor of the product who: [¶] . . . [i]s a 'person in the course of doing business' under Section 25249.11(b) of the Act, and [¶] . . . [h]as designated an agent for service of process in California, or has a place of business in California." (Regs., § 25600.2, subd. (e)(5), italics added.) "Actual knowledge," for purposes of this regulation, means "the retail seller receives information from any reliable source that allows it to identify the specific product or products that cause the consumer product exposure. Such knowledge must be received by the retail seller, its authorized agent or a person whose knowledge can be imputed to the retail seller. (Regs., § 25600.2, subd. (f)(1).) Further, "[w]here the source of a retail seller's knowledge is a notice pursuant to Section 25249.7(d)(1) of the Act, the retail seller shall not be deemed to have actual knowledge of any consumer product exposure alleged in the notice until five business days after the retail seller receives the notice. The notice must provide sufficient specificity for the retail seller to readily identify the product or products subject to the notice, in accordance with Article 9, section 25903(b)(2)(D)." (Regs., § 25600.2, subd. (f)(2).)

These regulations were adopted in furtherance of the statutory directive in Health and Safety Code section 25249.11, subdivision (f), that "[i]n order to minimize the burden on retail sellers of consumer products including foods, regulations implementing Section 25249.6 shall to the extent practicable place the obligation to provide any warning materials such as labels on the producer or packager rather than on the retail seller, except where the retail seller itself is responsible for introducing a chemical known to the state to cause cancer or reproductive toxicity into the consumer product in question." (OEHHA, Final Statement of Reasons, Title 27, California Code of Regulations, Proposed Repeal of Article 6 and Adoption of New Article 6, Regulations for Clear and Reasonable Warnings (2016) p. 35 (2016 FSOR).)

The agency stated, "By adopting these new regulations, OEHHA intends to address many of the issues that have surfaced since the original regulations were adopted in 1988 by clarifying the relative responsibilities of manufacturers and others in the chain of distribution for products that are eventually sold at retail . . . ." (2016 FSOR, *supra*, p. 9.) As to retail sellers, the agency explained, Regulations "Section 25600.2 is based on the premises that (1) the consumer must receive the warnings mandated by [Health and Safety Code] Section 25249.6 of the Act before being exposed to a chemical known to cause cancer or reproductive toxicity; and (2) the primary responsibility for providing the warning for products, including foods, is with the manufacturer, producer, packager, importer, or distributor of those products. The regulations therefore recognize that those parties are primarily responsible for providing warnings. This is reasonable, as manufacturers usually will have greater knowledge than retailers of a product's chemical content and whether it causes chemical exposures that require a warning." (2016 FSOR, p. 35.)

35

Amazon, in the trial court, argued it was *not* a retail seller, and Lee therefore maintains Amazon forfeited any claim to the contrary and cannot rely upon the actual knowledge requirement pertaining to retail sellers. Amazon continues to argue it was not part of the chain of distribution at all and consequently was not responsible for providing Proposition 65 warnings, but adds that "[a]ssuming *arguendo* that Amazon is subject to this duty, the only classification that could apply is the end of the chain—i.e., the 'retail seller.' "

The trial court found it unnecessary to determine whether Amazon is a retail seller or whether Regulations section 25600.2, subdivision (e), applies retroactively to this case (as the product sales at issue preceded the 2016 amendments) because of the broad definition of parties required to provide Proposition 65 warnings ("person in the course of doing business") and the fact Amazon did not claim to be a "retail seller" without responsibility for warnings pursuant to the 2016 regulation (Regs., § 25600.2, subd. (e)). Yet the court relied on the definition of "actual knowledge" in this regulation in finding Lee failed to establish Amazon had actual knowledge that the products contained mercury.

The trial court was clearly correct to reject Amazon's claim to be outside the chain of distribution. Proposition 65 imposes the duty to provide warnings on any "person in the course of doing business," which unquestionably includes Amazon's activities here. As the trial court explained, "there is no language in section 25249.l l(f) ['definitions' for Proposition 65] or the new regulations expressly limiting the duty to provide a Proposition 65 warning only to a 'manufacturer, producer, packager, importer, supplier, or distributor of a product,' or a 'retail seller' (under more limited circumstances described in C.C.R. § 25600.2(e)), or limiting the broad

36

language in the operative statute imposing the warning requirement on any 'person in the course of doing business' who 'knowingly and intentionally expose[s] any individual' to a listed chemical. (Health & Saf. Code § 25249.6.) The phrase 'person in the course of doing business' is broadly worded and not limited to parties in the chain of distribution of a product or whose status is defined in the regulations. (See Health & Saf. Code, § 25249.11(b).)" Amazon manages and oversees all aspects of third-party sales on its Web site, including accepting payment and providing refunds to customers on sellers' behalf, providing the only channel for communication between customers and sellers, earning fees from sellers for each completed sale and, for sellers utilizing the FBA program, storing the products and arranging for their delivery to customers. There can be no question Amazon was, in the words of one court, "pivotal in bringing the product here to the consumer." (*Bolger v. Amazon.com* (2020) 53 Cal.App.5th 431, 438 (*Bolger*).)

This leaves two questions regarding Amazon's reliance on Regulations section 25600.2, subdivision (e): Does the regulation even apply to this case, in which the salient events preceded adoption of the regulation? And, if so, is Amazon a "retail seller" within the meaning of the regulation?

The 2016 regulations became operative on August 30, 2018 (<https://oehha.ca.gov/proposition-65/crnr/notice-adoption-article-6-clear-and-reasonable-warnings> [as of Mar. 11, 2022]). Although the product sales at issue in this case predated even the date the regulations were adopted, much less their operative date, Amazon argues the regulations apply retroactively because they simply clarified existing law. *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232 (*Western Security*), the authority Amazon relies upon, explains that while "statutes do not operate retrospectively unless the Legislature plainly intended them to do so," "a statute that merely *clarifies,*

37

rather than changes, existing law does not operate retrospectively even if applied to transactions predating its enactment." (*Id.* at p. 243.)

*Western Security* involved a conflict between the antideficiency statute prohibiting judgments for any loan balance remaining after a lender's nonjudicial foreclosure and the rule that the obligation of the issuer of a letter of credit is independent of any underlying contract between the issuer's customer and the letter's beneficiary. After a Court of Appeal ruled that the issuer of a letter of credit could decline to honor it after notice it would be used to satisfy a deficiency after a nonjudicial foreclosure sale, the Legislature adopted a bill expressly intended to abrogate the Court of Appeal decision and confirm the beneficiary's right to rely upon both the real estate collateral and the letter of credit. *Western Security* held the new legislation had "no impermissible retroactive consequences" because the Legislature made clear it was "a clarification of the state of the law before the Court of Appeal's decision," intended to "apply to all existing loans secured by real property and supported by outstanding letters of credit." (*Western Security, supra,* 15 Cal.4th at pp. 237–238.)

The "clarification" provided by Regulations section 25600.2, subdivision (e), is entirely different. As we have said, the regulation was adopted as a means of implementing the Legislature's directive that the agency adopt regulations minimizing the "burden on retail sellers of consumer products" by "to the extent practicable plac[ing] the obligation to provide any warning materials such as labels on the producer or packager rather than on the retail seller," except as specified. (Health & Saf. Code, § 25249.11, subd. (f); 2016 FSOR, *supra*, p. 35.) Prior regulations had not addressed the allocation of responsibility. OEHHA described Regulations section 25600.2 as "a new, mandatory regulation addressing the relative responsibility of product

38

manufacturers and others in the chain of distribution, versus the product retail seller." (2016 FSOR, pp. 8–9.) The specific requirements of this new regulation "clarified" these relative responsibilities in the sense that they had not previously been spelled out, not as an expression of what had always been required. Given the high level of detail in the regulation—from delineation of the specific circumstances in which a retail seller is responsible for providing warnings to the definition of, and parameters for attributing, actual knowledge—it is impossible to view the regulation as merely clarifying the law that previously existed.

Moreover, OEHHA chose to make the 2016 regulations operative two years after they were adopted. (Gov. Code, § 11343.4, subd. (b)(2).)[26] This two-year period is expressly addressed in regulations concerning " 'safe harbor' " warnings (warnings that comply with content and method of transmission requirements "that have been determined 'clear and reasonable' by the lead agency"). (Regs., § 25600, subds. (a) & (b).) Subdivision (b) of section 25600 of the Regulations provides that a warning for a consumer product manufactured prior to August 30, 2018, is "deemed to be clear and reasonable if it complies with" the prior regulation. The 2016 FSOR explained that the two-year implemental period was intended to "avoid the difficulties and expense involved for manufacturers and retail sellers to locate all products bearing the old warnings." (2016 FSOR, *supra*, pp. 13–14.) The delayed effective date applied to all the 2016 regulations, and is clearly

---

[26] With specified exceptions, a regulation required to be filed with the Secretary of State becomes effective on the quarterly basis established in Government Code section 11343.4, subdivision (a). One of the exceptions is where "[a] later date is prescribed by the state agency in a written instrument filed with, or as part of, the regulation . . . ." (Gov. Code, § 11343.4, subd. (b)(2).)

39

inconsistent with any intent that the new regulations be applied retrospectively.

Amazon, therefore, cannot rely on Regulations section 25600.2, subdivision (e), to support the trial court's determination that Lee was required to prove actual knowledge.

Nor does Regulations section 25600.2 indicate Proposition 65, in general, contains an actual knowledge requirement. In fact, the introduction of an express "actual knowledge" requirement for retail sellers in the 2016 regulation is itself an indication that actual knowledge was *not* previously required to trigger the obligation to provide Proposition 65 warnings. By specifying that retail sellers are responsible for providing warnings only if they have actual knowledge of the potential consumer exposure (and no upstream entity can readily be compelled to provide the warning), Regulations section 25600.2, subdivision (e)(5), implicitly indicates there are circumstances in which constructive knowledge is sufficient to require provision of a warning. It is a familiar rule of statutory interpretation that "[a] construction making some words surplusage is to be avoided." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387.) The same rules of construction apply to initiative measures. (*Williams v. Superior Court* (2001) 92 Cal.App.4th 612, 622.) If OEHHD viewed all references to knowledge in the Proposition 65 regulations as meaning actual knowledge, it would not have needed to include an express "actual" knowledge requirement in Regulations section 25600.2, subdivision (e). The purpose of this regulation was to distinguish retail sellers' obligations from those of entities higher on the chain of distribution. One of the ways it does so is by requiring "actual knowledge" where the statutory phrase "knowingly"

40

would otherwise connote—and had been interpreted as including—actual *or* constructive knowledge.

The critical question, of course, is whether the *electorate* intended "knowingly and intentionally" to mean solely actual knowledge or constructive knowledge as well. As we have said, because Proposition 65 is "a remedial law, designed to protect the public," we construe its provisions "broadly to accomplish that protective purpose." (*People ex rel. Lungren v. Superior Court, supra*, 14 Cal.4th at p. 314; *Center for Self-Improvement & Community Development v. Lennar Corp., supra*, 173 Cal.App.4th at pp. 1550–1551.)

The preamble to Proposition 65, section 1 of the law proposed to the voters, makes clear the measure was driven by the voters' desire for greater protection against hazardous chemicals, specifically including information about exposures, strict enforcement and deterrence of actions threatening public health and safety. The preamble states: "The people of California find that hazardous chemicals pose a serious potential threat to their health and well-being, that state government agencies have failed to provide them with adequate protection, and that these failures have been serious enough to lead to investigations by federal agencies of the administration of California's toxic protection programs. The people therefore declare their rights: [¶] (a) To protect themselves and the water they drink against chemicals that cause cancer, birth defects, or other reproductive harm. [¶] (b) *To be informed about exposures to chemicals that cause cancer, birth defects, or other reproductive harm.* [¶] (c) *To secure strict enforcement of the laws controlling hazardous chemicals and deter actions that threaten public health and safety.* [¶] (d) To shift the cost of hazardous waste cleanups more onto offenders and less onto law-abiding taxpayers. [¶] The people hereby enact the provisions

41

of this initiative in furtherance of these rights." (Ballot Pamp., Gen. Elec. (Nov. 4, 1986) text of Proposition 65, p. 53, italics added.) (Hereafter Ballot Pamp.)

The public policy reflected in these findings and stated purposes militates in favor of an interpretation of the "knowingly and intentionally" requirement of Health and Safety Code section 25249.6 as including constructive knowledge. (See *Tsasu, supra,* 62 Cal.App.5th at p. 719 ["defining 'knowledge' in [quiet title statute] to encompass both actual and constructive knowledge is the result dictated by public policy"].) Interpreting section 25249.6 to require warnings only when a person in the course of doing business has actual knowledge that he or she will expose any individual to a listed chemical would significantly limit the reach of the statute and create incentives to avoid information that might reveal potential sources of exposure.

*Tsasu* offers an illustration, albeit in a different context. Pursuant to the statute at issue in that case, a third party acting in reliance on a quiet title judgment retains its property rights, even if that judgment is subsequently invalidated as void, if the third party "qualifies as a 'purchaser or encumbrancer for value . . . without knowledge of any defects or irregularities in [the earlier quiet title] judgment or the proceedings.' ([Code Civ. Proc.,] § 764.060.)" (*Tsasu, supra,* 62 Cal.App.5th at pp. 716–717.) Among its reasons for construing "knowledge" in the statute as including both actual and constructive knowledge, the *Tsasu* court explained that limiting "knowledge" to actual knowledge "creates wholly perverse incentives because it discourages prospective buyers from checking the record of title or from heeding 'warning signs' necessitating further inquiry—lest they acquire actual knowledge of a defect or irregularity with a quiet title judgment that

42

would strip them of section 764.060's protection. Such incentives are inimical to the entire system of real property law in California, which places upon real estate buyers a duty to inquire into the validity of their prospective ownership claim [citation], and to heed—not ignore—any ' "reasonable warning signs" ' [citations]." (*Id.* at pp. 719–720.) The court declined to interpret the statute as limited to actual knowledge, in part, because the statute was not intended to "encourage recklessness or willful ignorance." (*Id.* at p. 720.)

In the context of Proposition 65, limiting the obligation to provide warnings to actual knowledge would create incentives for businesses to avoid information that might alert them to the presence of hazardous chemicals and potential for exposures. This result would be inimical to the protective purpose of the law generally, and specifically to the voters' stated purposes of furthering the dissemination of information about exposures to toxic chemicals, strict enforcement of laws controlling hazardous chemicals and deterrence of actions that threaten public health and safety. (Ballot Pamp., *supra,* p. 53.)

Amazon argues the trial court's interpretation of Health and Safety Code section 25249.6 as requiring actual knowledge is supported by cases "confirm[ing] that a duty to disclose a fact cannot arise without actual knowledge of the fact." The cases it relies upon, however, are not particularly helpful. In *San Diego Hospice v. County of San Diego* (1995) 31 Cal.App.4th 1048, the plaintiff sought recission of a release on a theory of fraudulent nondisclosure of facts the defendant of which the defendant allegedly had imputed knowledge. (*Id.* at p. 1055.) The court explained that in order to establish the duty to disclose underlying the claim, the plaintiff must show "the material fact is known to (or accessible only to) the defendant" and "*the*

43

*defendant knows the plaintiff is unaware of the fact and cannot reasonably discover the undisclosed fact.*" (*Ibid*.) Because the duty to disclose "requires some element of scienter—knowledge of the other party's ignorance," it could not arise if the material facts were not "*actually* known" to the defendant: "We cannot perceive how it is possible for a principal to know the other party is ignorant of something of which the principal is equally ignorant." (*Id.* at pp. 1055–1056.) This reasoning, specific to the scienter element of the tort claim at issue, has no bearing on the meaning of the knowledge requirement in a statute requiring warnings of potential exposures to hazardous chemicals.

The other case Amazon cites is no more apt. *Santiago v. Firestone Tire & Rubber Co.* (1990) 224 Cal.App.3d 1318 involved employees' claims under Labor Code section 3602, subdivision (b), which provides an exception to the general rule that workers' compensation is the sole and exclusive remedy for injured workers, permitting an action for damages against the employer where the employee's injury is aggravated by the employer's " 'fraudulent concealment of the existence of the injury and its connection with the employment.' " (*Santiago.* at p. 1323.) *Santiago* held the employees were required to show the employer had actual knowledge of the employees' injuries and fact they were caused by their employment, rejecting the argument that constructive knowledge should apply based on a detailed analysis of the "history of Labor Code section 3602, the language of the statute, and the cases construing it." (*Id.* at pp. 1331–1334.) Amazon quotes the *Santiago* court's statement that " 'defendant obviously could not be charged with concealing matters which it did not know.' " (*Id.* at p. 1334.) But the issue in the present case is not *concealment* of facts, and the holding that fraudulent concealment necessarily requires actual knowledge says

nothing about the statutory meaning of "knowingly" with respect to the obligation to provide warnings of potential exposures under Proposition 65. There is nothing rationally or logically inconsistent with a requirement that a business provide warnings—or be liable for failure to do so—if it knows *or has sufficient reason to know* it is exposing "any individual" to a listed toxic chemical.

Amazon finds support for its argument that Health and Safety Code section 25249.6 requires actual knowledge in the fact that this provision uses the phrase "knowingly *and intentionally*" while section 25249.5, which prohibits discharge of chemicals into water, uses only "knowingly." Relying on the rules of statutory interpretation that instruct us to, if possible, give significance to every word and avoid a construction that renders some words surplusage (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230), Amazon argues we cannot ignore the inclusion of "intentionally" in Health and Safety Code section 25249.6. With this much, we agree. But we do not agree with Amazon's conclusion that the phrase "knowingly and intentionally" "imposes a higher level of knowledge" than the word "knowingly" alone.

As we have said, neither Proposition 65 nor the regulations define "intentionally." " ' "When a term goes undefined in a statute, we give the term its ordinary meaning.' " (*De Vries v. Regents of University of California* (2016) 6 Cal.App.5th 574, 590–591.) 'In divining a term's "ordinary meaning," courts regularly turn to general and legal dictionaries.' (*Id.* at p. 591; *People v. Hodges* (1999) 70 Cal.App.4th 1348, 1355.)" (*Upshaw v. Superior Court* (2018) 22 Cal.App.5th 489, 504.)

There is overlap in dictionary definitions of the terms "knowingly" and "intentionally"; definitions of the former sometimes refer to the latter and

each is considered a synonym of the other.[27]  But definitions of "knowingly" tend to focus on awareness[28] while definitions of "intentionally" tend to focus on purpose.[29]

---

[27] For example, the Oxford English Dictionary (3d ed. 2015) (OED) includes "intentionally" in its definition of "knowingly" (OED Online <https://oed.com/view/Entry/104167?redirectedFrom=knowingly#eid> [as of Mar. 11, 2022]); Merriam-Webster's Thesaurus lists "intentionally" and "knowingly as synonyms for each other.  (Merriam-Webster's Thesaurus Online <https://www.merriam-webster.com/thesaurus/intentionally> [as of Mar. 11, 2022]; <https://www.merriam-webster.com/thesaurus/knowingly> [as of Mar. 11, 2022].)

[28] For example, "knowingly" is defined by the OED as "[w]ith knowledge or awareness (of what one is doing, of a fact, etc.); consciously, intentionally."  (OED Online <https://www.oed.com/view/Entry/104167?redirectedFrom=knowingly#eid> [as of Mar. 11, 2022]) and by Merriam-Webster Unabridged Dictionary (Merriam-Webster) as "with awareness, deliberateness, or intention" (Merriam-Webster Dict. Online  <https://unabridged.merriam-webster.com/unabridged/knowingly> [as of Mar. 11, 2022]).  Black's Law Dictionary defines "knowing" as "[h]aving or showing awareness or understanding; well-informed" and "[d]eliberate; conscious," and "knowingly" as "[i]n such a manner that the actor engaged in prohibited conduct with the knowledge that the social harm that the law was designed to prevent was practically certain to result; deliberately."  It explains:  "A person who acts *purposely* wants to cause the social harm, while a person who acts *knowingly* understands that the social harm will almost certainly be a consequence of the action, but acts with other motives and does not care whether the social harm occurs."  (Black's Law Dict. *supra,* p. 1042, col. 2.)

[29] Examples include "with intention, on purpose" (OED Online <https://www.oed.com/view/Entry/97497?redirectedFrom=intentionally#eid> [as of Mar. 11, 2022]) and "in an intentional manner:  with intention: purposely" (Merriam-Webster Dict. Online <https://unabridged.merriam-webster.com/unabridged/intentionally> [as of Mar. 11, 2022).  Black's Law Dictionary, *supra*, page 965, defines "intentional" as "[d]one with the aim of carrying out the act."

46

To give significance to each word used in Health and Safety Code section 25249.6, it is more reasonable to view "intentionally" as adding this concept of purpose than as giving "knowingly" a different meaning than it would have when used on its own. We see no basis for reading "intentionally" in section 25249.6 as essentially modifying "knowingly" to require a higher level of knowledge than "knowingly" would otherwise convey. As we have said, an actual knowledge requirement would narrow the scope of section 25249.6, contrary to the purpose of Proposition 65. (See *California Manufacturers & Technology Assn. v. State Water Resources Control Bd.* (2021) 64 Cal.App.5th 266, 281–282 [statutory term with alternative definitions construed as intended to carry the meaning more consistent with legislative purpose].) The inclusion of "intentionally" in this statute, as opposed to section 25249.5, is an insufficient basis for the interpretation Amazon seeks.[30]

Finally, Amazon points to the absence in Proposition 65 of language often used to indicate a statute contemplates constructive knowledge. (E.g.,

_____

[30] One explanation for the distinction in language between these two statutes might lie in the different degree of regulation each provides. Health and Safety Code section 25249.5 is an outright prohibition against contamination of drinking water. In prohibiting businesses from "knowingly" discharging or releasing listed chemicals into water or land where they probably will pass into a source of drinking water, this statute appears to contemplate liability when the business is aware that the discharge or release it causes contains the listed toxin and is likely to reach a source of drinking water, regardless of whether it intends this result. Health and Safety Code section 25249.5 is less restrictive, requiring warnings but not prohibiting the act that causes exposure to the chemical. In keeping with this lower level of regulation, the statutory requirement is triggered only where the defendant is not only aware but also intends to take the action that results in the exposure—in the case of a consumer product, intends to take the action that moves the product toward the consumer.

47

Labor Code, § 2810 ["A person or entity shall not enter into a contract or agreement for labor or services . . . where the person or entity knows or should know that the contract or agreement does not include funds sufficient to allow the contractor to comply with all applicable . . . laws . . ."]; Civ. Code, § 3426.1 [" 'Misappropriation' means:  [¶] (1)  Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"].)  While the presence of such language may compel a conclusion that the statute encompasses constructive knowledge, its absence is not dispositive.  (E.g., *PacifiCare Life & Health Ins. Co. v. Jones* (2018) 27 Cal.App.5th 391, 417–418 [upholding regulation defining "knowingly," in statute delineating unfair and deceptive insurance business practices, as including constructive knowledge]; *Tsasu, supra,* 62 Cal.App.5th at pp. 717–721 [construing "knowledge" in quiet title statute as including constructive knowledge].)

We conclude the trial court erred in ruling that Lee was required to prove Amazon had actual knowledge the products at issue contained mercury and excluding evidence of constructive knowledge.  Of course, this error would be of no consequence if Lee is correct that the record demonstrates substantial evidence of actual knowledge *as a matter of law*.  Lee argues Amazon had actual knowledge of the mercury in the Faiza and Face Fresh skin-whitening creams from the RAPEX notices and for the Monsepa cream from Lee's notice of violation.  He does not contend Amazon had actual knowledge as to the Meiyong products.

Lee's argument is strongest with respect to the Monsepa cream.  Lee asserts that a notice of violation necessarily establishes actual knowledge, citing the definition of Regulations section 25600.2, subdivision (f)(2), which expressly treats a notice of violation as a source of a retail seller's actual

48

knowledge.[31]  As we have said, Regulations section 25600.2 is not applicable to the present case.  But "[p]roof of actual knowledge focuses on what information a defendant must have been aware of" (*People v. ConAgra Grocery Products Co.*, *supra,* 17 Cal.App.5th at pp. 84–85), and the notice of violation was directly served on Amazon.

Amazon does not dispute the general proposition that a notice of violation establishes actual knowledge, but it argues the notice in the present case was insufficient to do so.  The notice of violation named Amazon and aztopselstore.com (the distributor of Monsepa cream) as violators, specified the chemical ("Mercury"), routes of exposure ("Ingestion, Dermal, Inhalation") and type of harm ("Developmental Toxin"), and identified the products as "[s]kin-lightening creams" with "Monsepa Express Peeling Night Face Cream, 15 mL size" as an example.  Amazon argues the reference to "[s]kin-lightening creams" did not provide notice as to any specific product, and the CDPH's investigation, which found mercury in only seven of over a hundred skin-lightening creams tested, demonstrated most such creams do not contain mercury.  Amazon further argues the fact that the notice of violation named "Monsepa Express Peeling Night Cream" was insufficient to establish knowledge because the product Lee had tested for this litigation has a

---

[31] The regulation states that " '[a]ctual knowledge' means the retail seller receives information from any reliable source that allows it to identify the specific product or products that cause the consumer product exposure" and "[w]here the source of a retail seller's knowledge is a notice pursuant to [Health and Safety Code] Section 25249.7(d)(1) of the Act, the retail seller shall not be deemed to have actual knowledge of any consumer product exposure alleged in the notice until five business days after the retail seller receives the notice.  The notice must provide sufficient specificity for the retail seller to readily identify the product or products subject to the notice, in accordance with Article 9, section 25903(b)(2)(D)."  (Regs., § 25600.2, subd. (f)(1), (2).)

49

different name ("Monsepa Express Peeling" per packaging; "Monsepa Express Peeling Remove Dark Spots Face Cream" on Amazon listing).

Amazon's argument is not persuasive. As Lee points out, the regulations require a notice of violation to provide "the name of the consumer product or service, or the specific type of consumer product or services, that cause the violation, with sufficient specificity to inform the recipients of the nature of the items allegedly sold in violation of the law and to distinguish those products or services from others sold or offered by the alleged violator for which no violation is alleged." (Regs., § 25903, subd. (b)(2)(D).) OEHHA has explained that this regulation is meant to avoid identification of the products at issue in "very broad terms, such as 'various aerosol, paint, adhesive and/or automotive products, including but not limited to,' " that are "inadequate to describe the nature of the violation that is claimed." (OEHHA, Final Statement of Reasons, Adopt Section 12908, Notices of Violation, title 22, Division 2, California Code of Regulations, p. 10.) On the other hand, the agency stated, "[c]learly it would be sufficient simply to say 'aerosol spray paint,' 'car wax' or 'paint thinner.' Such a description would at least identify the category of products that will be the subject of the action, and would enable the public agency to focus the investigation." (*Ibid.*)

Lee's notice of violation satisfied these parameters. The notice of violation informed Amazon that a category of products—"skin-lightening creams"—allegedly caused exposure to mercury and specifically named one such product. Although the product Lee had tested was identified with a slightly different name on the Amazon Web site, the notice, Web site listing, and product packaging all used the distinctive "Monsepa Express Peeling" identifier. In our view, this constituted notice that the Monsepa skin-

50

lightening cream Lee put at issue here was alleged to contain mercury and, thus, was evidence of actual knowledge.

In arguing Amazon had actual knowledge that the Faiza and Face Fresh creams contained mercury from the RAPEX notices for these products, Lee relies on Kosnoff's testimony that Amazon employees in Europe review RAPEX notices; Amazon would have been aware of the 2013 RAPEX notice for Faiza Beauty Cream; and he was aware a "very similar" product was listed on the American Web site. This testimony is less definitive proof of actual knowledge than the evidence regarding the Monsepa cream: Kosnoff described a general business practice that would be expected to result in Amazon's awareness of the RAPEX notices, but his testimony also raised questions about the relationship between and management of Amazon's European and American Web sites which are not addressed by any evidence in the record. The RAPEX notices may well provide persuasive evidence of constructive knowledge, but we cannot find them sufficient to establish actual knowledge *as a matter of law* so as to overturn the trial court's finding of no actual knowledge.

Because the trial court precluded evidence of constructive knowledge, we have no means of evaluating whether Lee will be able to make a showing sufficient to alter the ultimate outcome of this case.[32]  Evidence of

---

[32] In finding Amazon did not have actual knowledge that the skin-lightening creams contained mercury, the trial court noted that mercury was not identified as an ingredient on the packaging or product detail pages.  Lee argues the absence of information on a product's label cannot be the basis for finding an absence of actual knowledge, an argument also maintained by the Attorney General in his amicus brief; otherwise, Amazon could avoid liability even if it was informed by the third-party seller or any other reliable source that the product contained mercury.  We do not read the trial court as having held the absence of information on the products' packaging or product detail pages was dispositive of the actual knowledge issue; the court went on to say

51

constructive knowledge must be evaluated in the context of all relevant circumstances bearing on what Amazon had reason to know or reasonably should have known.  This will presumably include facts related to Amazon's business operations and role in bringing the products to customers as well as the statutory context.

With regard to the latter, Health and Safety Code section 25249.11, subdivision (f), makes clear that the Legislature did not intend all parties involved in bringing a consumer product into the hands of the consumer to bear the same responsibility for providing the warnings required by Proposition 65 and, specifically, intended to minimize the burden on retail sellers in most cases.  Amazon's assertion that it is not a retail seller is part of its broader argument that it is not a part of the chain of distribution at all, and therefore not subject to section 25249.6.  As we have said, this broader argument unsustainable.  But Amazon's fallback position—that if it is part of the chain of distribution, the only thing it can be considered is a retail seller—is not unreasonable.  There is no evidence to support characterizing Amazon as a manufacturer, producer, packager, importer, or distributor of the products at issue.  Regardless of whether it comes within ordinary definitions of "retail seller" or can be considered a "seller" if it does not take title of the product in question (see *Milo & Gabby LLC v. Amazon.com, Inc.* (Fed. Cir. 2017) 693 Fed. Appx. 879, 890 [Amazon not a "seller" for purposes of copyright infringement claim]), Amazon's role in the present case was

---

that Lee failed to establish Amazon had actual knowledge "at any earlier time," perhaps a reference to evidence such as the RAPEX notices and CDPH notice.  It should be obvious that while packaging indicating a listed toxin is an ingredient would supply actual knowledge, absence of such information on product labeling, in and of itself, is far too limited a basis for finding an absence of knowledge, actual or otherwise.

analogous to a retail seller's for purposes of Health and Safety Code section 25249.6 in that Amazon had nothing to do with determining the contents, manufacturing or labelling of the skin-lightening products. As OEHHA noted regarding the 2016 regulations, entities such as manufacturers, producers and packagers "usually will have greater knowledge than retailers of a product's chemical content and whether it causes chemical exposures that require a warning." (2016 FSOR, *supra,* p. 35.) Still, Amazon made the products available for purchase by the ultimate consumer and, at a minimum, facilitated the sale by providing a forum for it to take place, handling the finances of the transaction and controlling communications between the customer and the third-party sellers. All these facts may be relevant considerations with respect to what knowledge can be attributed to Amazon.

## III.

The trial court found Lee failed to prove that Amazon exposed consumers to mercury because he did not prove anyone actually used the skin-lightening products at issue. The trial court noted that Lee "did not present any evidence of exposure related to any of the product purchasers, despite obtaining those purchasers' contact information from Amazon during discovery"; the evidence established "there has been a public campaign to discourage the use of skin-lightening creams that may contain mercury, including a buy-back program for new and used products"; and "[t]here was no evidence that anyone was exposed to mercury in connection with any of the four units that were actually purchased by plaintiff's counsel through Amazon's marketplace."

Lee maintains the trial court's interpretation of "expose" improperly narrowed the scope of Proposition 65, imposing a burden that would make it

all but impossible to enforce the law with respect to consumer products due to the expense of obtaining evidence that more than a minimal number of people opened and used a product they purchased. Lee points out that consumer products may be sold to millions of customers, many of whom may remain anonymous if the products were purchased in stores that do not keep records of individual purchasers or, if identifiable, may be unwilling to participate in litigation.

Moreover, Lee argues, proof of individual consumers' use of the products is unnecessary because common sense dictates a conclusion that people purchase products in order to use them. Lee and the Attorney General both point to the statutory maxim that "[t]hings happen according to the ordinary course of nature and the ordinary habits of life." (Civ. Code, § 3546.) Thus, the Attorney General, drawing on his experience in enforcing Proposition 65, states he "always assumed that people who buy cookies eat them; people who buy sodas drink them; and people who buy skin creams apply them to their skin." The Attorney General states, "companies do not sell products that their customers will not use, and consumers do not buy skin creams unless they intend to apply them to their skin. Accordingly, in his cases, the Attorney General has not provided declarations from consumers that they ate the lead-containing cookies, took the vitamins, or used the anti-diarrheal medicine that have been the subject of his Proposition 65 claims" and no court has "ever even suggested that such evidence was necessary." Indeed, as Lee points out, when Lee sought a preliminary injunction in this case, one of Amazon's arguments in opposition was that the request was made two years after the complaint was filed and, "[b]ecause Amazon blocked the sale of the relevant Products long ago, the only

54

reasonable inference is that the Products have been completely used since they were last purchased."

The Proposition 65 regulations define "expose" as meaning "to cause to ingest, inhale, contact via body surfaces or otherwise come into contact with a listed chemical. An individual may come into contact with a listed chemical through water, air, food, consumer products and any other environmental exposure as well as occupational exposures." (Regs., § 25102, subd. (i).) In article 6, "Clear and Reasonable Warnings," "[c]onsumer product exposure" is defined as "an exposure that results from a person's acquisition, purchase, storage, consumption, or any reasonably foreseeable use of a consumer product, including consumption of a food. (Regs., § 25600.1, subd. (e).) When this regulation was adopted in 2016, OEHHA's FSOR included the statement, "If a person's use of a product is 'reasonably foreseeable' even if it is not entirely consistent with label recommendations, any resulting exposures to listed chemicals can properly be considered to be 'knowing and intentional' on the part of the product manufacturer, and are therefore subject to Proposition 65." (2016 FSOR, *supra*, p. 31.)

The trial court viewed the definition of "consumer product exposure" as requiring proof of an "actual 'exposure' " and the agency's explanatory statement as confirming that "foreseeability may impact knowledge and intent, but it does not eliminate the requirement of exposure." In our view, however, the regulatory definition of "consumer product exposure" provides less insight into the meaning of "expose" as used in Health and Safety Code section 25249.6 than the trial court attributed to it. The explanatory statement the trial court noted was in response to a comment seeking to alter the definition of "consumer product exposure" by replacing the phrase "*any reasonably foreseeable* use of a product" with "use of a product *in accordance*

55

*with recommendations made in the product's labels or labeling or with other actual and accepted uses of the product"* or "use of the product *in accordance with the product labeling recommendations or ordinary conditions of use."* (2016 FSOR, *supra*, p. 31.) OEHHA rejected the proposed revision because it would "unnecessarily limit the potential exposure scenarios to listed chemicals" and "[l]imiting the scope of the definition would not be consistent with the Act." (*Ibid.*) The foreseeability issue addressed in the agency's statement pertained only to the "use" component of the provision defining "consumer product exposure," serving to limit the extent to which a business subject to Proposition 65 is required to anticipate the ways its product might be used. No such clarification was necessary for the other sources of exposure listed in the regulation (purchase, acquisition, storage).

The regulation defines "consumer product exposure" by describing the sources from which an exposure can result, but it does not define what "exposure" actually consists of. The phrase "consumer product exposure" appears in article 6 of the Act ("Clear and Reasonable Warnings"), in regulations describing the required contents of Proposition 65 warnings and methods by which they may be provided. (Regs., §§ 25601, 25602, 25603.) Regulations section 25600, subdivision (a), provides that "[n]othing in Article 6 shall be interpreted to determine whether a warning is required for a given exposure under Section 25249.6 of the Act." The original lead agency also distinguished between the definition of "consumer product exposure" and the definition of "expose" for purposes of Health and Safety Code section 25249.6. Responding to a comment that "consumer exposures are triggered by the purchase of a product, rather than by consumption," the agency stated: "The definition of 'consumer products exposure,' however, is not intended to establish when an exposure occurs. · It is intended to address the availability

56

of the 'safe harbor' warning.  The term 'expose' is defined elsewhere as meaning 'to cause to ingest, inhale, contact via body surfaces or otherwise come into contact with a chemical.' "  (Former Cal. Code Regs., tit. 22, § 12201, subd. (f) [now tit. 27, § 25102, subd. (i)].)  "This could include the purchase by an individual of a product, not just the consumption of that product."  (1988 FSOR, *supra*, p. 10.)[33]

[33] Arguing that this agency explanation "does not establish that an exposure *necessarily* occurs only from a purchase," Amazon points to statements in the 2016 FSOR which it says explain that "a person who purchases a product is not necessarily exposed" and "[i]n some cases, exposure will not occur until the product packaging is opened."

The first of these statements (italicized below) is part of a comment submitted to OEHHA regarding its proposed regulation defining "retail seller" (Regs., § 25600, subd. (l)):  "In the definition for 'retail seller,' the term, 'purchasers' should be changed to 'consumers,' both for consistency and to avoid inadvertently including wholesale distributors.  *Often, the consumer of the product, and thus the individual who is exposed, is not the purchaser*." (2016 FSOR, *supra*, p. 33.)  OEHHA responded that it agreed and had replaced the term "purchasers" with "consumers."  (*Ibid*.)  Read in context, it is apparent that the point was to avoid language that might be taken as extending the regulation restricting circumstances in which retail sellers are required to provide Proposition 65 warnings to sellers that do not sell directly to consumers, not to suggest that sale to a consumer does not expose the consumer to a listed chemical in the product.

The second statement (italicized below) is from the OEHHA's response to a comment that a proposed regulation specifying methods for providing safe harbor consumer product exposure warnings (Regs., § 25602, subd. (a)) was unclear as to "whether a warning is required on both the immediate container and the outer packaging of a product."  (2016 FSOR, *supra,* p. 87.) OEHHA responded in the negative, explained that the regulations provided several options for warnings, then stated, "*[t]he warning should be placed in such a manner as to ensure that it is seen and understood prior to exposure. For example, . . . if a person will be exposed to a listed chemical immediately upon opening a product's outer packaging through contact with the product, the warning should be placed on the outer container or wrapper*."  (*Ibid*.)  This guidance is obviously directed at those in a position to provide warnings on

Lee's claim in the present case is that Amazon violated the requirement of Health and Safety Code section 25249.6 that a business shall not knowingly and intentionally "expose" any individual to a listed chemical without first providing clear and reasonable warning.  The ordinary definition of "expose" is "[t]o lay open (to danger, ridicule, censure, etc.)." (OED, "expose" OED Online <https://www.oed.com/search?searchType=dictionary&q=expose&_searchBtn =Search> [as of Mar. 11, 2022]; Merriam-Webster Dict. Online, "expose" ["to lay open (as to attack, danger, trial, or test)"] <https://unabridged.merriam-webster.com/unabridged/expose> [as of Mar. 11, 2022].)  The original lead agency expressly relied upon this general definition of "expose" in explaining the rule it adopted for calculating whether a business employs 10 or fewer employees (and therefore is not subject to the requirements of Proposition 65).  (1988 FSOR, *supra,* pp. 19, 26 <https://oehha.ca.gov/media/downloads/crnr/art13fsorjan1988.pdf> [as of Mar. 11, 2022].)  The rule requires counting all full- and part-time employees "on the date on which the discharge, release or exposure occurs."  (Former Cal. Code Regs., tit. 22, § 12102; now tit. 27, § 25102, subd. (h).)  Discussing the rule in the context of exposure to agricultural products, the agency rejected the assumption that exposure occurs on the date the product is consumed:  "In fact, nothing provides that exposure occurs only at the time a particular consumer good is consumed.  The term 'expose' generally means 'to lay open,' as to something which is injurious or dangerous.  Laying an individual open to a chemical hazard through a consumer product could

products and their packaging, such as manufacturers and packagers, to ensure such warnings are not placed where they may be overlooked by the consumer.  It does not address the meaning of "expose" with respect to a business that sells a product to the consumer.

result from any act which propels the product toward the individual." (1988 FSOR, p. 19.)

This interpretation makes clear that the original lead agency understood its definition of "expose" to refer to any act that brings the product containing a listed chemical into contact with an individual, regardless of the individual's actual use. "Expose," in other words, refers to potential exposure as well as realized exposure. The regulatory definition of "expose" has not changed in any meaningful way, and we are not aware of any departure from the lead agency's original interpretation. That interpretation is consistent with the statutory requirement that Proposition 65 warnings be provided *before* an individual is exposed to a listed chemical. (Health & Saf. Code, § 25249.6.) Necessarily, consumer product exposure warnings must be provided prior to or concurrent with sale to the retail consumer; once the product has reached the consumer, the seller, manufacturer or other party in the chain of distribution would have no means of providing a warning. The regulations' safe harbor warning requirements for consumer products specify that the warning must be provided by one or more of four means, all of which entail visibility to the consumer prior to or during a purchase;[34] for Internet purchases, warnings must be provided prior to completion of the purchase. (Regs., § 25602, subds. (a) & (b).)

---

[34] These means are: "A product-specific warning provided on a posted sign, shelf tag, or shelf sign, for the consumer product at each point of display of the product"; "A product-specific warning provided via any electronic device or process that automatically provides the warning to the purchaser prior to or during the purchase of the consumer product, without requiring the purchaser to seek out the warning"; "A warning on the label that complies with the content requirements in Section 25603(a)"; and/or "A short-form warning on the label that complies with the content requirements in Section 25603(b)" and is in a specified type size. (Regs., § 25602, subd. (a)(2)-(4).)

Interpreting "expose" by its ordinary meaning is also consistent with Proposition 65's protective purpose.  As we have said, the preamble to Proposition 65 expressly invoked the voters' "rights" to "be informed about exposures to chemicals that cause cancer, birth defects, or other reproductive harm[,]" and to "secure strict enforcement of the laws controlling hazardous chemicals and deter actions that threaten public health and safety."  (Ballot Pamp., *supra*, p. 53.)  Proposition 65 is not primarily about punishment for harm that has been inflicted; it is about protection from harmful chemicals, the ability to make informed choices about coming into contact with such chemicals, and deterrence of conduct that undermines these purposes.  The interpretation of Health and Safety Code section 25249.6 advanced by Amazon and adopted by the trial court would absolve a business that knowingly and intentionally, without warnings, sold a product whose intended use would necessarily cause the consumer to ingest, inhale or otherwise come into bodily contact with a listed chemical, if the consumer happened *not* to use the product he or she purchased.  This cannot be what the voters who enacted Proposition 65 intended.

The trial court cited *Consumer Cause v. Weider Nutrition Internat.* (2001) 92 Cal.App.4th 363, 370, for its statement that "[former section] 12201, subdivision (f) [now Cal. Code Regs., tit. 27, § 25102, subd. (i)] defines exposure in terms of a chemical . . . coming into contact with a person." *Consumer Cause* did not consider whether selling or otherwise providing a product containing a listed chemical to a consumer constitutes exposing the consumer to the chemical.  The issue in that case was whether the defendants exposed consumers to cancer-causing chemicals through products that did not contain any listed chemical but, when ingested, caused a chemical reaction in the body that increased natural levels of testosterone,

60

which can cause cancer. Holding the defendants' products did not expose consumers to cancer-causing chemicals within the meaning of Proposition 65, the *Consumer Cause* court explained that " '[t]he Act prohibits all means of directly bringing individuals into contact with chemicals known to the state to cause cancer . . .' " and the products at issue did not do so, since the increase in testosterone occurred only as a result of a reaction inside the body. (*Consumer Cause,* at p. 369.) The court further emphasized that ballot materials for Proposition 65 "focus[ed] on exposure to carcinogenic chemicals" and did not suggest Proposition 65 "was intended to apply when a person is exposed to a noncarcinogenic chemical which then causes a substance naturally occurring in the body to become carcinogenic." (*Consumer Cause*, at p. 370.)

Amazon argues that the need for evidence of "actual exposure" was particularly important in the present case because the total number of sales at issue was relatively small and there was a public health campaign to discourage use of skin-lightening creams, including a buy-back program that recovered some products before they were used. Aside from factual questions such as whether consumers who purchased the products at issue were aware of the public health notices or participated in the buy-back program, this argument begs the relevant question. The argument is premised on the assumption that Amazon cannot be said to have exposed a consumer to mercury in a skin-lightening cream unless and until the consumer has actually applied the cream to his or her skin. As we have explained, however, we understand "expose" as used in Health and Safety Code section 25249.6 as referring to potential as well as realized exposure from a product being used in the intended manner—"[l]aying an individual open to a chemical hazard"

61

by an "act which propels the product toward the individual." (1988 FSOR, *supra,* p. 19.)

Amazon certainly meets this definition. As described by the court in *Bolger, supra,* 53 Cal.App.5th at page 438, "Amazon placed itself between [the third-party seller and customer] in the chain of distribution of the product at issue here" by attracting customers to the Amazon Web site, providing product listings for the skin-lightening creams, receiving payment for the products, requiring communication between third-party sellers and customers to go through the Amazon Web site, demanding indemnification and fees for each purchase, and, for products using the FBA program, accepting possession of the product, storing it in an Amazon warehouse, and shipping it to the customer. "Whatever term we use to describe Amazon's role, be it 'retailer,' 'distributor,' or merely 'facilitator,' it was pivotal in bringing the product here to the consumer." (*Ibid.*)

Finally, Amazon argues we should infer Lee attempted but was unable to discover any evidence of "actual exposure" from the fact that Lee obtained an order from the trial court compelling Amazon to provide contact information for purchasers of the products at issue, but did not present any evidence of actual use of the products. Lee's motion to compel argued the contact information was "primarily relevant because it relates to Amazon's defense that it should not be required to send warnings to purchasers 'who have since used all the products,"[35] as Amazon had not offered any evidence

---

[35] When Lee sought a preliminary injunction, one of Amazon's arguments in opposition was that "[i]f the injunction is entered, Amazon will be required to email purchasers of third-party products who have since used all the Products—informing them that products they used might have contained mercury . . . ," which would not prevent further violations of Proposition 65, but "simply upset Amazon's customers, over products Amazon didn't even sell." The trial court denied the request for this emailed notice.

that customers were no longer using the creams they purchased. Lee also argued the customer contact information would lead to discovery of percipient witnesses and material relevant to Amazon's liability, with respect to both exposure and Amazon's operations and knowledge. In granting the motion to compel, the trial court found Lee had "sufficiently shown that the contact information of consumers who purchased the skin creams may well lead to relevant and/or admissible information, including as to: (1) the nature of the transactions and Amazon's role in them; (2) the extent to which a Proposition 65 warning was available or known to the consumer; (3) the extent to which the consumers (or their family members) were exposed to the product; (4) the extent to which exposures continue; and (5) whether there was any communication with Amazon about the mercury or other content." Amazon provided access to the customer contact information.

Neither the record nor Lee's briefs explain why he did not present evidence of individual consumers' use of the skin-lightening products. But we see no reason to infer customers who purchased skin-lightening creams through the Amazon Web site did not use them. "Things happen according to the ordinary course of nature and the ordinary habits of life." (Civ. Code, § 3546.) It is at least as likely Lee was unable to locate purchasers of the products willing to participate in this litigation, or decided not to pursue this source of potential evidence. Regardless, in light of our interpretation of Health and Safety Code section 25249.6, evidence of actual use was not necessary to establish the "expose" element of Lee's claims.[36]

---

[36] We are not persuaded by Lee's argument that the trial court precluded him from presenting the evidence of use it then found he failed to present. Lee points out that when his attorney asked Copan what evidence the CDPH found that skin-whitening cream was responsible for mercury contamination in homes, the trial court sustained Amazon's objection that

63

**IV.**

Lee contends the trial court erred in finding Amazon immune from liability for violating Proposition 65 under section 230 of the federal CDA. (§ 230(c)(1).) In relevant part, that section states, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." (*Ibid*.) The statute expressly preempts state laws that are inconsistent with its terms: "Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." (§ 230(e)(3).)

" 'Taken together, these provisions bar state-law plaintiffs from holding interactive computer service providers legally responsible for information created and developed by third parties. [Citation.] Congress thus established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them. [Citation.] State-

---

these investigations had no connection to products sold through Amazon. Lee's attorney stated that Amazon's brief had "argued there was no way to prove exposure from people purchasing skin-lightening creams" and "[w]hile it may seem rather obvious, I feel we now need to prove that people who use products that they purchase, and Ms. Copan has personal knowledge of how people have used other skin-lightening creams." The court responded, "I don't think the Judge needs a witness on that. I'm going to have to make a decision as to the application of the regs and the statue, as to whether 'ingest' means to physically ingest or whether it's reasonably foreseeable a product will be used in the manner anticipated. . . . I don't need Ms. Copan for that. [¶] As my father would say, that's common sense. The issue is what the law is." What the court precluded was testimony about how skin-lightening creams are used in general; what the court subsequently found lacking in Lee's case was evidence that the specific products at issue in this case were in fact used by a consumer after being purchased through Amazon's Web site.

64

law plaintiffs may hold liable the person who creates or develops unlawful content, but not the interactive computer service provider who merely enables that content to be posted online.' (*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.* (4th Cir. 2009) 591 F.3d 250, 254.)" (*Bolger, supra,* 53 Cal.App.5th at p. 463.)

" "[S]ection 230(c)(1) precludes liability that treats a website as the publisher or speaker of information users provide on the website. In general, this section protects websites from liability for material posted on the website by someone else." (*Doe v. Internet Brands, Inc.* (9th Cir. 2016) 824 F.3d 846, 850 (*Internet Brands, Inc.*).) "Immunity under section 230 extends to ' "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." ' (*HomeAway.com, Inc. v. City of Santa Monica* (9th Cir. 2019) 918 F.3d 676, 681 (*HomeAway.com*).)" (*Bolger, supra,* 53 Cal.App.5th at p. 463.) "[P]ublication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content . . . . [A] publisher reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it." (*Barnes v. Yahoo!, Inc.* (9th Cir. 2009) 570 F.3d 1096, 1102–1103 (*Barnes*).)

The trial court concluded all the elements of CDA immunity were satisfied in the present case, finding Amazon is an interactive computer service provider, Lee's claim is "predicated on information provided by another information content provider (i.e., the third-party sellers that provided the product descriptions without a Proposition 65 warning),"[37] and

---

[37] The trial court quoted *Oberdorf v. Amazon.com Inc.* (M.D.Pa. 2017) 295 F.Supp.3d 496, 501, a products liability case in which the district court

Lee "seeks to treat Amazon as the publisher or speaker of that information." The trial court viewed Lee's claims as seeking to impose liability on Amazon for "allowing third parties to list products for sale on its website without altering the disclosures and other content supplied by those third parties as to their own manufactured products."

Lee does not suggest Amazon is not an interactive computer service provider within the meaning of section 230, and does not dispute that the product descriptions for products sold on the Web site by third parties are provided by those parties.[38]  He argues, however, that his claims are not precluded by section 230 because they do not seek to treat Amazon as the publisher or speaker of information provided by the third-party sellers, but

---

stated, " 'Like an auctioneer, Amazon is merely a third-party vendor's "means of marketing," since third-party vendors—not Amazon—"cho[o]se the products and expose[]" them for sale by means of:  the Marketplace.' "  The same day the trial court entered judgment, *Oberdorf* was affirmed in part and vacated in part (*Oberdorf v. Amazon.com Inc.* (3d Cir. 2019) 930 F.3d 136, 153–154) in a decision which was then vacated when a petition for rehearing en banc was granted (*Oberdorf v. Amazon.com Inc.* (3d Cir. 2019) 936 F.3d 182).  The Third Circuit has since certified for review by the Pennsylvania Supreme Court the question whether, under Pennsylvania law, an "e-commerce business, like Amazon" is strictly liable for a defective product in the circumstances of that case.  (*Oberdorf v. Amazon.com, Inc.* (3d Cir. 2020) 818 Fed. Appx. 138, 143.)

[38] "Section 230 defines an ' "interactive computer service" ' as 'any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.' (§ 230(f)(2).)  The term ' "information content provider," ' meanwhile, 'means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.'  (§ 230(f)(3).)" (*Hassell, supra,* 5 Cal.5th at p. 535.)

rather to hold Amazon accountable for violation of its own independent obligations under Proposition 65.

"Congress enacted section 230 'for two basic policy reasons:  to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material.' " (*Hassell v. Bird* (2018) 5 Cal.5th 522, 534 (*Hassell*), quoting *Carafano v. Metrosplash.com, Inc.* (9th Cir. 2003) 339 F.3d 1119, 1122.)  The Ninth Circuit has explained:  "As the heading to section 230(c) indicates, the purpose of that section is to provide '[p]rotection for "Good Samaritan" blocking and screening of offensive material.'  That means a website should be able to act as a 'Good Samaritan' to self-regulate offensive third party content without fear of liability." (*Internet Brands, Inc., supra,* 824 F.3d at pp. 851–852.)

Section 230 was enacted in part in reaction to an unpublished state court decision[39] holding that "an internet service provider became a 'publisher' of offensive content on its message boards because it deleted some offensive posts but not others." (*Internet Brands, Inc., supra,* 824 F.3d at p. 852.)  Under the state court's reasoning "a website had to choose between voluntarily removing some offensive third party content, which would expose the site to liability for the content it did not remove, or filtering nothing, which would prevent liability for all third party content.  [Citation.]  'In passing section 230, Congress sought to spare interactive computer services this grim choice by allowing them to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete.' " (*Ibid.*, quoting *Fair*

---

[39] *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)

*Hous. Council v. Roommates.Com, LLC* (2008) 521 F.3d 1157, 1163
(*Roommates.Com*).) "Simply put, the immunity provision was " 'enacted to
protect websites against the evil of liability for failure to remove offensive
content.' " (*Internet Brands, Inc.,* at p. 852.)

Congress intended section 230 " ' "to promote the continued
development of the Internet and other interactive computer services . . . [and]
to preserve the vibrant and competitive free market that presently exists for
the Internet and other interactive computer services, unfettered by Federal
or State regulation." [Citations.] To that end, CDA immunity is to be
construed broadly, "to protect websites not merely from ultimate liability, but
from having to fight costly and protracted legal battles. " ' (*Cross v. Facebook,
Inc.* (2017) 14 Cal.App.5th 190, 206, 222.)" (*Bolger, supra,* 53 Cal.App.5th at
p. 463.)

Quoting *Gentry v. eBay, Inc.* (2002) 99 Cal.App.4th 816, 828 (*Gentry*),
the trial court stated that section 230(c)(1) "preempts state law and 'by its
"plain language," created a federal immunity to any cause of action that
would make interactive service providers liable for any information
originating with a third-party user of this service.' " In the trial court's view,
"all of the content at issue was provided by third-party sellers, not Amazon,"
the third-party sellers did not provide Proposition 65 warnings and "[t]hus, if
there is liability here, it is predicated entirely on the deficiencies in third-
party content on Amazon's online marketplace." The trial court described
Lee's claim as seeking to "treat Amazon as the publisher or speaker" of
"information provided by another information content provider (i.e., the
third-party sellers that provided the product descriptions without a
Proposition 65 warning)" and held it would be inconsistent with section
230(c)(1) to impose liability on Amazon for "failing to include a warning on

68

products sold on its website by third parties, based on product content developed by those third parties without any encouragement, assistance or direction from Amazon, and without evidence that Amazon was aware of the chemical content of those products before allowing the third parties to list them on its website." The court viewed Lee's claims as based on Amazon "allowing third parties to list products for sale on its website without altering the disclosures and other content supplied by those third parties as to their own manufactured products."

Amazon views *Gentry* as "determinative precedent." In that case, purchasers of what turned out to be forged autographed sports memorabilia alleged eBay violated Civil Code section 1739.7, which requires dealers of collectibles to furnish a certificate of authenticity to purchasers of autographed sports collectibles. (*Gentry, supra,* 99 Cal.App.4th at p. 820.) Although the plaintiffs argued they were attempting to enforce eBay's independent duty to furnish a warranty under Civil Code section 1739.7, the *Gentry* court held section 230 barred the claims because imposing liability on eBay would hold it responsible, as publisher, for content originating with other parties, as it was the individual sellers who falsely identified the product as authentically autographed in order to sell it on eBay. (*Gentry,* at pp. 831–832.) Other causes of action were similarly barred because they sought to hold eBay responsible for having notice of illegal conduct by third parties and failing to take action such as withdrawing or altering the content provided by those parties that would amount to "exercise of a publisher's traditional editorial functions." (*Id.* at p. 835.)

We do not see *Gentry* as dispositive of the issues in the present case. Lee does not suggest Amazon had any obligation to alter the content of the product descriptions provided by the third-party sellers or even to remove the

69

listings altogether.  Instead, Lee maintains Amazon should have added its own Proposition 65 warning, pursuant to its independent obligation under Proposition 65, based on its conduct in providing a mercury-containing product to consumers.  In *Gentry,* the plaintiffs' argument that they were seeking to enforce eBay's independent duty to provide the warranty of authenticity was unpersuasive because the statutory duty applied only to dealers in sports collectibles, and the plaintiffs' "specific allegations reveal eBay is not in the business of selling or offering to sell the collectibles at issue; rather, it is the individual defendants who sold the items to plaintiffs, using eBay as a venue." (*Gentry, supra,* 99 Cal.App.4th at p. 827.)  Here, Proposition 65 imposes a duty to warn on *every business* that "exposes" an individual to a listed chemical.  As we have said, Amazon did so by its "pivotal" role in "bringing the product here to the consumer." (*Bolger, supra,* 53 Cal.App.5th at p. 438; 1988 FSOR, p. 19 ["propel[ling] the product toward the individual"].)  Lee's claims are based on Amazon's conduct in exposing consumers to mercury-containing products without providing Proposition 65 warnings, not its failure to monitor, modify or remove third parties' listings for the products, and thus do not require treating Amazon as speaker or publisher of third-party content.[40]

---

[40] Like *Gentry,* other cases Amazon cites involved claims that necessarily based the defendants' alleged liability on actions traditionally within a publisher's role.  In *Cross v. Facebook, supra,* 14 Cal.App.5th at pages 194 and 207, we held CDA immunity barred claims seeking to impose liability for Facebook's failure to remove posts by users that allegedly incited violence and generated death threats against the plaintiffs.  *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.* (7th Cir. 2008) 519 F.3d 666, 668, 672, held section 230 barred claims that Craigslist.com violated laws against housing discrimination by hosting user posts advertising, for example, "no minorities" or "no children."  *Eberhart v. Amazon.com, Inc.* (S.D.N.Y. 2018) 325 F.Supp.3d 393, 400, footnote. 5, which

Contrary to Amazon's characterization, enforcing its obligations under Proposition 65 does not require it to "monitor, review, and revise" product listings. As both Lee and the Attorney General point out, the "knowingly and intentionally" requirement in Health and Safety Code section 25249.6 means Amazon is required to provide a warning where it has knowledge a product contains a listed chemical—for example, from public health alerts or direct notice. We recognize that any responsibility to provide warnings Amazon might have under section 25249.6 would not result in liability if the third-party seller of a skin-lightening product itself provided a Proposition 65 warning,[41] and that Amazon would have to review the product's packaging and/or listing on the Web site to determine whether a warning was provided by the third-party seller. These facts do not mean Lee's claims necessarily treats Amazon as a speaker or publisher of information provided by the third-party sellers. If Amazon has actual or constructive knowledge that a product contains mercury, it might *choose* to review the product listing to determine

held Amazon could not be held liable for injuries due to a defective product sold by a third-party seller, noted in passing that section 230 would bar any claim against Amazon "for the content it permitted [the seller] to post" on the Web site. *La Park La Brea A LLC v. Airbnb, Inc.* (C.D.Cal. 2017) 285 F.Supp.3d 1097, 1106, held section 230 barred a suit by the owner of apartments listed for rent on Airbnb.com in violation of the tenants' lease prohibition against subletting. *Doe v. Backpage.Com, LLC* (1st Cir. 2016) 817 F.3d 12, 22, applied section 230 immunity to claims that the Web site facilitated sex trafficking by enabling sex traffickers to advertise their victims for "escort" services. *Daniel v. Armslist, LLC* (Wis. 2019) 926 N.W.2d 710, held section 230 barred claims against a Web site that hosts ads by prospective sellers and purchasers of firearms for facilitating the illegal purchase of the weapon used in a mass shooting.

[41] Regulations section 25600.2, adopted in 2016, makes clear that the essential requirement is provision of a warning to the consumer, and expressly permits the parties in the chain of distribution to determine which one will be responsible for providing it.

whether the third-party seller had provided a Proposition 65 warning before providing the warning itself or removing the listing. But nothing inherently *requires* Amazon to do so. It could choose, instead, to act on its knowledge by providing the warning regardless, pursuant to its own obligations under Proposition 65.

*HomeAway.com* provides an example, albeit in different factual circumstances. HomeAway and another company whose Web site similarly allows individuals seeking rental accommodations to connect with hosts offering such rentals, challenged a city ordinance prohibiting short-term home rentals except for licensed home-shares in which residents remain on site with guests. (*HomeAway.com, supra*, 918 F.3d at p. 679.) The plaintiffs argued the ordinance was preempted by section 230 because it required them to monitor and remove third-party content—listings not in compliance with the ordinance. (*Id.* at p. 682.) The court explained that while the plaintiffs might *choose* to monitor or remove listings, the ordinance did not require them to do so, only to cross-reference the city's registry of licensed rentals before processing a requested booking. (*Id.* at pp. 682–683.)

As our Supreme Court has observed, "not all legal duties owed by Internet intermediaries necessarily treat them as the publishers of third-party content, even when these obligations are in some way associated with their publication of this material. (See, e.g., *Barnes, supra,* 570 F.3d at p. 1107 [regarding § 230 immunity as inapplicable to a claim of promissory estoppel alleging that an Internet intermediary promised to remove offensive content].)" (*Hassell, supra,* 5 Cal.5th at pp. 542–543.) Similarly, the Ninth Circuit has said "[i]t is not enough that third-party content is involved" and has "rejected use of a 'but-for' test that would provide immunity under the CDA solely because a cause of action would not otherwise have accrued but

for the third-party content.  [Citation.]  We look instead to what the duty at issue actually requires[.]" (*HomeAway.com, supra,* 918 F.3d at p. 682.)  " 'In evaluating whether a claim treats a provider as a publisher or speaker of user-generated content, "what matters is not the name of the cause of action"; instead, "what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." [Citation.]  Put slightly differently, "courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'  If it does, section 230(c)(1) precludes liability." ' (*Cross* [*v. Facebook*]*, supra*, 14 Cal.App.5th at p. 207.)" (*Bolger, supra,* 53 Cal.App.5th at p. 464.)

*Bolger, supra,* 53 Cal.App.5th at page 439, a products liability case involving a defective computer battery purchased from a third-party seller on Amazon's Web site, held section 230 did not shield Amazon from liability because the plaintiff's strict liability claims "depend on Amazon's own activities, not its status as a speaker or publisher of content provided by [the third-party seller] for its product listing."  The court first concluded that Amazon's extensive role in third-party sales, especially where the seller utilizes the FBA program (as in *Bolger* and for at least one of the products here), supported application of strict liability, describing that role in terms consistent with the evidence in this case. (*Bolger,* at pp. 452–453; *Loomis v. Amazon.com LLC* (2021) 63 Cal.App.5th 466 [agreeing with *Bolger* in case where seller did not use FBA].)[42]  After discussing two cases from other

_____

[42] The *Bolger* court noted that "Amazon created the environment (its website) that allowed [the third-party seller] to offer the replacement battery for sale"; "attracted customers through its own activities"; "set the terms of [the seller's] involvement"; "demanded fees in exchange for [the seller's] participation"; "required [the seller] to indemnify it"; "accepted possession of

jurisdictions that declined to apply section 230 immunity to strict liability claims, *Bolger* stated: "We agree with *Erie* [*Ins. Co. v. Amazon.com Inc.* (4th Cir. 2019) 925 F.3d 135] and *State Farm* [*Fire & Cas. Co. v. Amazon.com Inc.* (W.D.Wis. 2019) 390 F.Supp.3d 964] on this issue. Bolger's strict products liability claims target Amazon's role in 'the vertical distribution of consumer goods' (*Bay Summit* [*Community Assn. v. Shell Oil Co.* (1996)] 51 Cal.App.4th [762,] 773) as an 'integral part of the overall producing and marketing enterprise' for the [third-party seller's] replacement laptop battery (*Vandermark* [*v. Ford Motor Co.* (1964)] 61 Cal.2d [256,] 262). It is based on Amazon's own conduct, as described above, not the content of [the third-party seller's] product listing. Bolger's claims do not require a court to treat Amazon as the speaker or publisher of content provided by [the third-party seller]. The content of the product listing is not determinative, and it need not be attributed to Amazon to support strict liability. Instead, Amazon's own involvement in the distribution of an allegedly defective product

---

[the seller's] products, registered them in its inventory system, and stored them in an Amazon warehouse awaiting sale"; "created the format for [the seller's] offer for sale"; and "allowed [the seller] to use a fictitious name in its product listing." (*Bolger, supra,* 53 Cal.App.5th at p. 452.) Additionally, the product listing "does not conspicuously inform the consumer of the identity of the third party seller or the nature of Amazon's relationship to the sale"; the customer purchases the product by adding it to her Amazon cart and pays Amazon; under the FBA program, Amazon personnel retrieve the product from an Amazon warehouse and ship it to the customer in Amazon branded packaging (potentially together with items purchased from other sellers or Amazon itself); the seller is not involved in the sales transaction and "does not receive payment until Amazon chooses to remit the proceeds"; the customer sends returns to Amazon; and third-party sellers "are prohibited from communicating with Amazon customers except through the Amazon website, where such interactions are anonymized." (*Id.* at pp. 452–453.)

74

supports strict liability for the reasons we have already discussed." (*Bolger,* at p. 464.)

Other cases similarly distinguish claims that treat an interactive computer service provider as a publisher from claims that do not, despite being associated with third-party content. In *Barnes, supra,* 570 F.3d 1096, after a period of failing to respond to the plaintiff's requests to remove indecent material her former boyfriend posted without her consent on Yahoo.com, the company expressly promised to remove the material, then did not do so. (*Id.* at pp. 1098–1099.) The Ninth Circuit concluded the plaintiff's cause of action for "negligent undertaking" was barred by section 230 because it sought to hold Yahoo liable for failing to remove the offending material, which was publishing activity.

The plaintiff's cause of action for promissory estoppel, however, was not barred. (*Barnes, supra,* 570 F.3d at p. 1109.) Although the promise underlying this claim involved the same conduct—removing the material from the Web site—the duty allegedly violated "springs from a contract—an enforceable promise—not from any non-contractual conduct or capacity of the defendant." "Contract liability here would come not from Yahoo's publishing conduct, but from Yahoo's manifest intention to be legally obligated to do something, which happens to be removal of material from publication." (*Id.* at p. 1107.) The "outwardly manifested intention to create an expectation on the part of another . . . generates a legal duty distinct from the conduct at hand, be it the conduct of a publisher, of a doctor, or of an overzealous uncle." (*Id.* at p. 1108.)

*Internet Brands, Inc., supra,* 824 F.3d 846 provides another illustration of the same point. There, two individuals used the defendant's Web site, a networking Web site for the modeling industry, to lure the plaintiff to sham

auditions where she was drugged and raped.  (*Id.* at p. 848.)  The plaintiff alleged that the Web site owner had independent knowledge of the ongoing scheme but failed to warn her or other Web site users, in violation of a duty to warn imposed by California law, and the district court dismissed the action as barred by section 230.  (*Internet Brands, Inc.,* at pp. 848–850.)  Reversing, the Ninth Circuit explained that the plaintiff did not seek to hold the Web site owner liable as publisher or speaker of a third party's posted content, for failing to remove such content or for any conduct related to monitoring or failing to monitor posts on the Web site.  (*Id.* at p. 851.)  Instead, the plaintiff argued the defendant was liable for failure to warn her about information obtained from an outside source about the scheme being perpetrated on its Web site, which could be accomplished without altering or removing the third-party content, for example, by posting a warning on the Web site or emailing users.  (*Ibid.*)  Accordingly, the negligent failure to warn claim did not seek to hold the Web site owner liable as the " 'publisher or speaker of any information provided by another information content provider' " and section 230 did not bar the claim.  (*Internet Brands, Inc.,* at p. 851.)

Here, Lee claims Amazon violated Proposition 65 exposing consumers to mercury without warnings through its own conduct.  The claims do not attempt to hold Amazon responsible for third-party sellers' content (except in the sense that Amazon would have been able to disclaim responsibility for providing warnings if the sellers had provided them).  As we have discussed, the claims do not require Amazon to modify or remove third-party content but rather to provide a warning where Amazon's own conduct makes it subject to Health and Safety Code section 25249.6.

The Ninth Circuit cases make another point that is of critical importance here.  *HomeAway.com* emphasized that "[l]ike their brick-and-

76

mortar counterparts, internet companies must also comply with any number of local regulations concerning, for example, employment, tax, or zoning" and "allowing internet companies to claim CDA immunity under these circumstances would risk exempting them from most local regulations and . . . 'create a lawless no-man's-land on the Internet.' " (*HomeAway.com, supra,* 918 F.3d at p. 683, quoting *Roommates.com*, *supra,* 521 F.3d at p. 1164.) The court explained, "We have consistently eschewed an expansive reading of [section 230] that would render unlawful conduct 'magically . . . lawful when [conducted] online,' and therefore 'giv[ing] online businesses an unfair advantage over their real-world counterparts.' " (*HomeAway,* at p. 683, quoting *Roommates.com,* at p. 1164.) In this respect, " 'we must be careful not to exceed the scope of the immunity provided by Congress.' " (*Internet Brands, Inc., supra,* 824 F.3d at p. 853, quoting *Roommate.com,* at p. 1164, fn. 15.)

If a skin-lightening cream is sold in a brick-and-mortar drug store that was aware the product contained mercury, there is no question that retail seller would have some obligation to provide Proposition 65 warnings— depending, of course, on whether entities further up the distribution chain had provided warnings for the products and, if not, could be held to account. Nothing in the text or purposes of the CDA suggests it should be interpreted to insulate Amazon from responsibilities under Proposition 65 that would apply to a brick-and-mortar purveyor of the same product.

Not only would such an interpretation give Amazon a competitive advantage unintended by Congress in enacting the CDA, but it would be inimical to the purposes of Proposition 65. Amazon makes it possible for sellers who might not be able to place their products in traditional retail stores to reach a vast audience of potential customers. (E.g., *Bolger, supra,*

53 Cal.App.5th at p. 453 ["The Amazon website . . . enables manufacturers and sellers who have little presence in the United States to sell products to customers here"].) The evidence in this case indicates that mercury-containing skin-lightening products are overwhelmingly likely to have been manufactured outside the United States—unsurprisingly, as FDA regulations prohibit use of mercury as a skin-lightening agent in cosmetics. (21 C.F.R. § 700.13.) This makes it all the more likely Amazon may be the only business that can readily be compelled to provide a Proposition 65 warning for these products. (See 2016 FSOR, *supra*, p. 55 [discussing impracticality of enforcing warning requirement against foreign entity without agent for service of process in United States]; *Bolger, supra,* 53 Cal.App.5th at p. 453 [noting as first factor supporting application of strict liability doctrine to Amazon that it "may be the only member of the distribution chain reasonably available to an injured plaintiff who purchases a product on its website"].) Amazon is thus making available to consumers, and profiting from sales of, products that clearly require Proposition 65 warnings, yet are likely to have been manufactured and distributed by entities beyond the reach of reasonable enforcement efforts. Insulating Amazon from liability for its own Proposition 65 obligations in these circumstances would be anomalous.

Proposition 65, as we have said, " 'is a remedial law, designed to protect the public' " which must be construed " 'broadly to accomplish that protective purpose.' " (*Center for Self-Improvement & Community Development v. Lennar Corp., supra,* 173 Cal.App.4th at pp. 1550–1551, quoting *People ex rel. Lungren v. Superior Court, supra,* 14 Cal.4th at p. 314.) Moreover, states' "police powers to protect the health and safety of their citizens . . . are 'primarily, and historically, . . . matter[s] of local concern.' " (*Medtronic, Inc.*

78

*v. Lohr* (1996) 518 U.S. 470, 485.)  The United States Supreme Court has explained that "[w]hen addressing questions of express or implied pre-emption, we begin our analysis 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' [Citation]." (*Altria Group, Inc. v. Good* (2008) 555 U.S. 70, 77.)  The "strong presumption against displacement of state law . . . applies not only to the existence, but also to the extent, of federal preemption.  [Citation.]  Because of it, 'courts should narrowly interpret the scope of Congress's "intended invalidation of state law" whenever possible.' [Citation]." (*Brown v. Mortensen* (2011) 51 Cal.4th 1052, 1064.)

As the Ninth Circuit has explained, Congress intended "to preserve the free-flowing nature of Internet speech and commerce without unduly prejudicing the enforcement of other important state and federal laws.  When Congress passed section 230 it didn't intend to prevent the enforcement of all laws online; rather, it sought to encourage interactive computer services that provide users *neutral* tools to post content online to police that content without fear that through their 'good samaritan . . . screening of offensive material,' [citation], they would become liable for every single message posted by third parties on their website." (*Roommates.com, supra,* 521 F.3d at p. 1175, quoting § 230(c).)

The text of section 230(e)(3) is clear that state laws inconsistent with section 230 are preempted while those consistent with section 230 are *not* preempted.  Proposition 65's warning requirement is an exercise of state authority to protect the public that imposes obligations on any individual who exposes another to a listed chemical.  Proposition 65 is not inconsistent with the CDA because imposing liability on Amazon for failing to comply with its

own, independent obligations under Proposition 65, does not require treating Amazon as the publisher or speaker of third-party sellers' content. Accordingly, if Lee can establish all the elements of a violation of Proposition 65, section 230 does not immunize Amazon from liability.

## DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings in accordance with the views expressed in this opinion.

On remand, if Lee is able to establish all the elements of his claims as to the products purchased from Amazon and tested for mercury content, the trial court shall determine whether the products with different ASINs identified in Lee's pretrial brief as among the 11 products at issue were in fact the same products as the ones for which samples were tested, and shall determine penalties in accordance with Health and Safety Code section 25249.7 for any violations of Proposition 65 established.

_____
Kline, J.*

We concur:

_____
Richman, Acting P.J.

_____
Stewart, J.

*Lee v. Amazon* (A158275)

     *Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

81

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Hon. Robert McGuiness |
| Attorney for Plaintiff and Appellant Larry Lee: | Law Office of Jonathan Weissglass<br>Jonathan Weissglass<br><br>Greenfire Law<br>Rachel S. Doughty<br>Jessica L. Blome |
| Attorneys for Amicus Curiae on behalf of Plaintiff and Appellant: | Rob Bonta<br>Attorney General of California<br>Dennis A. Ragen<br>Roxanne Carter<br>Deputy Attorneys General |
| Attorneys for Amicus Curiae As you Sow on behalf of Plaintiff Appellant: | Danielle R. Fugere<br>Chelsea J. Linsley |
| Attorneys for Amicus Curiae Center For Food Safety on behalf of Plaintiff and Appellant: | Altshuler Berzon<br>Barbara J. Chisholm<br>P. Casey Pitts |
| Attorneys for Amici Curiae Black Women for Wellness and the Mercury Policy Project/Tides Center on behalf of Plaintiff and Appellant: | Environmental Law Clinic<br>Mills Legal Clinic at Stanford Law School<br>Deborah A. Sivas<br>Molly Loughney Melius |
| Attorneys for Defendant and Respondent Amazon.com, Inc.: | Doll Amir & Eley<br>Gregory L. Doll<br>Brett H. Oberst<br>Jamie O. Kendall<br>Lloyd Vu |
| Attorneys for Amicus Curiae The Civil Justice Association of California on behalf of Defendant and Respondent: | Law Office of Fred. J. Hiestand<br>Fred J. Hiestand |